Robert A. MORRISON, d/b/a Morrison Enterprises, Plaintiff-Appellant,

v.

MURRAY BISCUIT COMPANY, Defendant-Appellee.

No. 85–2825.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1986.

Decided July 31, 1986.

David B. Weisman, Weisman & Jancha, P.C., South Bend, Ind., for plaintiff-appellant.

Philip A. Whistler, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for defendant-appellee.

Before POSNER and FLAUM, Circuit Judges, and MAROVITZ,[*] Senior District Judge.

POSNER, Circuit Judge.

Murray Biscuit Company, a producer of cookies and crackers, terminated Morrison, one of its wholesale distributors, who responded by suing Murray Biscuit under section 1 of the Sherman Act, 15 U.S.C. § 1. The suit charges that Morrison was terminated pursuant to a conspiracy between Murray Biscuit and Feldman, a food broker, to suppress price competition between Feldman and Morrison. From a judgment for the defendant entered after a purported bench trial, 617 F.Supp. 800 (N.D.Ind.1985), Morrison appeals, raising a procedural question as well as substantive questions of antitrust law.

The procedural question is whether the judge denied Morrison his right to a trial. The judge's opinion states that after waiving their right to a jury trial "the parties stipulated that the evidence on the issue of liability would consist of the exhibits admitted in evidence and the depositions published and admitted in evidence." But did they stipulate to this? There was no written stipulation; the judge apparently had in mind the discussion at a status conference held shortly before the bench trial was to begin. The failure to put the supposed stipulation in writing leaves us with the wearisome task of drawing inferences from the transcript of the protracted conference.

At the conference the lawyers and judge agreed that damages would be determined (if necessary) after liability. The judge pressed counsel to stipulate to the facts on liability and "brief them, and then I will give you oral argument in lieu of—you know, I will give you that much Court time and then I will decide it. Then we will see what happens. Now why should you parade all these witnesses in here to prove the obvious?" Morrison's counsel replied, "I don't think we need to parade very many witnesses. I think we have agreed in the

[*] Hon. Abraham L. Marovitz of the Northern District of Illinois, sitting by designation.

pretrial order that certain witnesses are going to testify by deposition." The judge then looked through the depositions and said, "I propose to admit all of those depositions in evidence as part of the evidence before the Court in the bench trial of this case in toto. Objections? Then you can argue them and stipulate and fuss and fume. But I am going to take you off of your trial setting. I will tell you that right now." Murray Biscuit's counsel did not object. Morrison's counsel said that his "only problem is that was a discovery deposition of Mr. Morrison by the defendant. I told him as I tell all clients that if a question wasn't asked he didn't have to answer it, and there may be questions we would want to get in through him that aren't in there." The judge replied, "Let's get it filed, admit it into evidence, and we will see what you need to do.... Be realistic. You are all busy. As soon as you are out of here somebody else is yelling at you and you are trying to satisfy them.... I am taking you off the trial calendar, however. I am telling you that right now. It is not because of anything you have done. I am not going to be here."

The discussion then turned to a missing deposition, which the judge urged counsel to file. Morrison's counsel replied: "I don't think there is any problem." The judge said, "When we have all this before us where are we as far as evidence is concerned in the case?" Morrison's counsel replied: "I don't think there are any objections on either side to the other's exhibits with the exception of the fact that in my packet of evidence and again I didn't bring it over today thinking we were going to have a trial I have a plaque that will be"—at which point he was interrupted by the judge's saying, "Haven't you learned we are full of surprises over here." Counsel replied, "I am learning in a big hurry. We have a plaque that will be admitted in lieu of a photograph."

After admitting some more evidence the judge said, "Now having all this in the record what do we need. I am going to give you oral argument.... Let me know since I have surprised you all, but I think probably haven't hurt anybody, and I have accomplished something for myself as far as calendaring is concerned.... Your record ought to be—and you know I am not foreclosing the idea that you cannot supplement this record by some agreement or something. Seems like to me by the time you get this last deposition in and all your exhibits goodness gracious you ought to have everything you need." The judge then set a schedule for briefing and oral argument, and wound up the discussion by saying, "I am telling you I saved you all time and money and I didn't hurt anybody's rights. If you have a big complaint about what happened, why, you know, look back after it is all over and say, Hey, you didn't do something right, and tell me about it right away so we can correct it."

This conference was held on March 5, 1985. The parties duly filed their briefs, and oral argument was heard on August 8. The district judge rendered his decision in favor of the defendant a month later. The plaintiff filed no post-trial motions.

■ Morrison's counsel argues that the judge coerced him to give up his right to a trial (the judge twice said he was taking the case off the trial calendar), even though counsel had made clear to the judge that he wanted an opportunity to examine Morrison more extensively than his opponent had done at Morrison's deposition. The objection to short-circuiting the trial had indeed been made, but as so often happens in these conferences soon dropped from sight. By the end of the conference the judge could reasonably believe that the lawyers had consented to have him determine liability on the basis of the depositions and other documents, without live testimony, subject to the right of either party to request later that the record be supplemented. This resolution of the matter placed the burden on Morrison's counsel of asking to put Morrison on the stand or redepose him, and no such request was made. When counsel put together his brief in the district court he should have considered what if any gaps the record con-

tained and should have taken the necessary steps to fill them by asking the judge to reopen the record. He did not do this. The judge's closing comment at the conference suggested that such a request might be timely even after he rendered his decision; but no post-trial motions were filed. By his inaction Morrison's counsel forfeited any objection to the judge's deciding the issue of liability on the basis of the documentary record agreed to at the status conference.

■ The judge was not acting improperly in suggesting that the parties allow him to determine liability on that record. The time available for trials in the district courts of this circuit is inadequate and efforts must be made to economize on it. The lawyers cannot be relied on always to do this, if for no other reason than that they do not bear the costs in delay which they impose on other litigants who want trials. It is inevitable in this era of staggering judicial caseloads that many trial judges will take a more aggressive role than has been traditional in this country in shaping and streamlining litigation, and one method of streamlining is to substitute documentary for live evidence. Some may object that the judge who takes the initiative in pressing the parties to agree to trial by documents is unconsciously imitating his Continental counterparts. See generally Langbein, *The German Advantage in Civil Procedure*, 52 U.Chi.L.Rev. 823 (1985). Whatever the abstract merits of these objections, they are unlikely to persuade. The rise of the "pro-active" judge, the search for cheap and fast substitutes for the conventional Anglo-American trial, the convergence of the American and Continental systems (see *id.* at 858–66; Resnik, *Managerial Judges*, 96 Harv.L.Rev. 374, 386 (1982))—all these developments are well under way and are probably irreversible.

Both reflecting and helping along this movement toward a larger role for the trial judge in shaping civil litigation, the amendments made in 1983 to Rule 16 (pretrial conferences) of the Federal Rules of Civil Procedure—amendments applicable to this case even though the case started before they were adopted, see 97 F.R.D. 165 (1983) —direct the district judge to play an expanded role in managing civil litigation before him. The conference on March 5 rapidly turned into—in fact, though not in form—a final pretrial conference, at which "the participants ... shall formulate a plan for trial, including a program for facilitating the admission of evidence." Fed.R. Civ.P. 16(d). The transcript of that conference was, in effect, the final pretrial order. See Fed.R.Civ.P. 16(e). Although a formal pretrial order, in which several witnesses were listed for the plaintiff, had been entered almost a year earlier and was not formally modified, courts have never required formality when it comes to modifying pretrial orders, realizing that such a requirement would be incompatible with the pace, uncertainty, and sheer confusion of the litigation process. See, e.g., *Gorby v. Schneider Tank Lines, Inc.*, 741 F.2d 1015, 1022 (7th Cir.1984); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 n. 9 (9th Cir.1985); cf. *United States v. First Nat'l Bank*, 652 F.2d 882, 886 n. 3 (9th Cir.1981). The parties and the judge may well have forgotten about the original pretrial order in this case.

It does not follow that because the judge is to take an active role in encouraging the parties to simplify and expedite the trial he may coerce them to give up their procedural rights; he may not; the distinction between suggestion and compulsion must be maintained. Some of Judge Sharp's remarks that we have quoted could be read as intended to intimidate (though it is equally possible that they were intended humorously—a transcript does not convey tone of voice); and his repeated statement that he was taking the case off the trial calendar was peremptory. But as Morrison's counsel acknowledged at the oral argument of this appeal, he did not want a full trial; all he wanted was a chance to ask his client a few more questions and put the answers into the record, and we do not think that Judge Sharp's remarks, considered as a whole, can reasonably be un-

derstood as having ruled out so modest a supplementation of the record. Indeed, he expressly invited it. Morrison's counsel declined the invitation.

It would have been better if the judge had told the parties to put the stipulation that he had extracted from them (or perhaps just thought he had extracted) in writing. Then Morrison's counsel would have known exactly where he stood. The omission is unfortunate but is not reversible error. The responsibility for having dropped the ball was as much counsel's as the judge's. The case is less troublesome than *May v. Evansville-Vanderburgh School Corp.*, 787 F.2d 1105, 1115–16 (7th Cir.1986), where we found that the plaintiff had implicitly consented to a trial on the documents submitted with the cross-motions for summary judgment, or *Stewart v. RCA Corp.*, 790 F.2d 624, 630–31 (7th Cir. 1986), where we found that the plaintiff had implicitly consented to a summary bench trial of a dispositive defense instead of the jury trial he could have claimed as his right. These cases show that important procedural rights can be forfeited by inaction and inadvertence as well as by express waiver (see also *United States v. 1966 Beechcraft Aircraft*, 777 F.2d 947, 950–51 (4th Cir.1985)), though in this case, as a matter of fact, it seems that the plaintiff was happy with the abbreviated procedure suggested by the judge until he discovered he had lost the case.

Moreover, applicable here at least by analogy is the rule that a party who wants to preserve an objection to the exclusion of evidence must, unless the substance of the excluded evidence is obvious, make an offer of proof. Fed.R.Evid. 103(a)(2). Otherwise the appellate court cannot judge whether the omission could really have made a difference. Morrison's failure to particularize the evidence that he would have introduced in a fuller proceeding makes us doubt whether the truncation of the proceeding actually harmed him and also reinforces our suspicion that his present objection to the procedure is no more than a last-ditch effort to prolong the litigation.

The substantive issue raised by the appeal is whether the district court clearly erred in finding that Murray Biscuit had not violated Morrison's rights under the antitrust laws. Virtually the entire case for Morrison is the letter terminating him. It reads as follows:

Dear Mr. Morrison:

Due to repeated violations of your agreement with Murray Biscuit Company concerning:

a. Certified-Chicago—an account that you have been repeatedly instructed not to call on; yet you have continued to do so.

b. Utilizing confidential information to undercut prices.

We feel that it is not permissible for you to continue representing Murray Biscuit Company due to your continued failure to follow directives and the policies of this company.

This notice takes effect immediately.

Sincerely,

MURRAY BISCUIT COMPANY

To understand the letter you must understand Murray Biscuit's system of distribution, which involves both food brokers such as Feldman and warehouse distributors such as Morrison. In the case of sales through brokers, the broker takes orders from grocery stores and forwards them to Murray Biscuit, which ships the goods directly to the grocery store; the broker has no inventory. Murray Biscuit determines the price to be charged the grocery store, invoices the store and receives payment back, and remits to the broker 5 percent of the invoice price as compensation for his services. In the case of warehouse distributors, Murray Biscuit sells the goods to the distributor, who resells them to the grocery store, making delivery from his own warehouse. Murray Biscuit occasionally drop ships, however—meaning that the goods, though sold by the distributor, are shipped from Murray Biscuit's own stock.

The price at which Murray Biscuit sells to the warehouse distributor is its price to the

grocery store on brokered sales minus 8 percent, but the distributor is free to resell to the grocery store at any price he wants. Suppose Murray Biscuit's price for selling to grocery stores is $1 for a particular good. Sales to grocery stores through brokers will be made at $1 and Murray Biscuit will remit 5¢ to the broker, while sales to warehouse distributors will be at 92¢ and the warehouse distributor can resell to the grocery store at any price he wants. On average, though, if 8¢ is a correct estimate of the cost of distribution borne by the warehouse distributor, including a reasonable profit, the distributor will resell at or near $1. The higher estimated cost of distribution (8¢ versus the 5¢ commission received by the broker) reflects the added expense—of warehouse, inventory, and delivery—borne by a warehouse distributor in comparison to a broker.

Complicating the picture slightly is the fact that the warehouse distributors are actually "broker-distributors," meaning that they can if they want make sales as brokers, receiving the 5 percent commission and leaving to Murray Biscuit the tasks of billing, collection, inventory, shipping, insurance, etc. Morrison made few sales as a broker and they are not germane to this litigation, so we shall continue to call him simply a warehouse distributor.

■ Murray Biscuit had assigned particular customers to particular middlemen, whether brokers or warehouse distributors. Agreements by which a supplier limits the territories in which, or the customers to which, his dealers or distributors may resell his goods are lawful unless unreasonable, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); and, to establish unreasonableness, the first thing a plaintiff must do is prove that the supplier had significant market power—that is, power to raise price above the competitive level without losing so many sales that the price increase would be unprofitable. See, e.g., *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir.1982); *The Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 537 (7th Cir.1986); *Hennessy Industries Inc. v. FMC Corp.*, 779 F.2d 402, 404–05 (7th Cir.1985); *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 191 (7th Cir.1985). Since Murray Biscuit has less than 2 percent of the national market in cookies and crackers, and since, being nonperishable and light, these goods really are traded in a national (probably international) market, it is a more than safe guess that Murray Biscuit does not have significant market power; so any challenge to its assigning customers would fail at the threshold. In any event Morrison does not claim that the customer assignment is unlawful; the assignment is merely the backdrop for the termination. Feldman, a food broker in Chicago, had been assigned the Certified stores there. He complained to Murray Biscuit that Morrison was trying to sell its goods to Certified in violation of the assignment. This complaint precipitated Morrison's termination; Murray Biscuit even sent Feldman a copy of the letter of termination.

■ One insurmountable obstacle to making an antitrust violation out of Morrison's termination is the absence of a price-fixing agreement, and price fixing is the only antitrust offense that Morrison charges. There isn't a shred of evidence either that (1) Murray Biscuit and Morrison agreed on the prices that Morrison would charge to resell Murray Biscuit's cookies and crackers or that (2) Morrison and Feldman agreed on those prices. No one ever told Morrison to raise, or change, or not to lower a price. It might seem that for Feldman to have complained about Morrison's prices implies the existence of a price-fixing agreement to which Morrison was a party but which he broke. But Feldman may merely have been complaining about Murray Biscuit's failure to bring Morrison into the conspiracy, and a failure to conspire is not a conspiracy. More plausibly, Feldman was complaining because Morrison was entering his territory and doing so effectively, i.e., by undercutting him. The economists' "Law of Demand" teaches that if the quantity supplied in a market rises,

the price must fall in order to induce consumers to buy the greater quantity. Hence if Morrison wanted to supply biscuits to stores already supplied by Feldman he had to offer a lower price, and when he did so this confronted Feldman with the choice of lowering his own price or losing sales, and naturally he squawked. All this has nothing to do with price fixing; it merely reflects the fact that price cutting is the natural concomitant of breaking an agreement allocating customers.

The only other possibility is that Morrison was terminated as an incident to (3) a price-fixing conspiracy between Murray Biscuit and Feldman, one term of which was that Murray Biscuit would cut off any wholesaler who competed with Feldman. The biggest problem with this theory besides the lack of any evidence for it beyond the letter of termination—which, as we have just seen, does not prove that Feldman was a party to any price-fixing conspiracy—is that Feldman was a broker, and brokers do not set their own prices. It is not the law that if someone hires a real estate broker to sell his house for $100,000 he and the broker have made an agreement to fix the resale price of the house and are therefore guilty of a per se violation of the Sherman Act, carrying felony penalties. The Supreme Court held long ago that a supplier can lawfully fix the prices charged by his agents, *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), and if it were not for later decisions a citation to *General Electric* would be a complete answer to Morrison's claim. The principal decision is *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). There the Supreme Court, while refusing to overrule *General Electric* (a factually very similar case) explicitly, held that Union Oil, by fixing the prices at which its dealers resold its gasoline to consumers, was guilty of price fixing, even though Union Oil had a consignment agreement with the dealers. Title passed from Union Oil to the consumer; the dealer was an agent, not a buyer and reseller.

The consignment agreement in *Simpson* was an agreement, cf. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 786–87, 104 S.Ct. 2731, 2750–51, 81 L.Ed.2d 628 (1984) (dissenting opinion); the question was whether it was a price-fixing agreement. In support of the affirmative answer that the Supreme Court gave, one can point out that the rule against price fixing would have an enormous loophole if a supplier could avoid the rule by substituting a consignment contract for the normal sales contract with its dealers. They would still be dealers; and if the law forbids the supplier to fix the retail price when title passes, it is not apparent why it should permit him to fix that price when title is retained. Passage of title has lost its magic in commercial law, see, e.g., UCC § 2–509(2); why should it retain it in antitrust law? The Supreme Court's experiment (a veering away from *Simpson*) with allowing suppliers to do more in the way of restricting distribution by means of consignment or other agency agreements than sale agreements, see *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 379–82, 87 S.Ct. 1856, 1865–67, 18 L.Ed.2d 1249 (1967), was abandoned in *Continental T.V., Inc. v. GTE Sylvania Inc., supra*, 433 U.S. at 52–56, 97 S.Ct. at 2558–60.

The challenge is to reconcile *Simpson* with the proposition that a homeowner does not violate section 1 of the Sherman Act when he tells his broker at what price to sell his home. The courts' travails in meeting this challenge, well discussed in 7 Areeda, Antitrust Law ¶ 1473 (1986), include such ingenious metaphoric flights as asking whether the agent and his principal constitute "a unified economic consciousness incapable of conspiring with itself." *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1317 (8th Cir.1986). We think the key to reconciliation is to be found by asking whether the agency relationship has a function other than to circumvent the rule against price fixing. The consignment arrangement in *Simpson* was described by the Court as "a so-called retail dealer 'consignment' agreement" (377 U.S. at 14, 84 S.Ct. at 1053), a "clever manipulation of

words" (*id.* at 22, 84 S.Ct. at 1057), a "wooden formula for administering prices on a vast scale" (*id.*; footnote omitted), an "easy manipulation" (*id.* at 24, 84 S.Ct. at 1058), and a product of "clever draftsmanship." *Id.* There is no suggestion that the brokerage arrangement between Murray Biscuit and Feldman is artificial or unnatural. Feldman really is just an order taker for Murray Biscuit and other suppliers. He has no interest in or capacity for setting the retail prices of the goods he brokers. This is not inconsistent with his being concerned about underpricing by Morrison. If Murray Biscuit charged such a low wholesale price to Morrison that the sum of that price plus Morrison's cost of distribution was less than the price at which Murray Biscuit sold its goods to grocery stores through brokers (that is, if the 8 percent spread between the price to the warehouse distributor and the price at which Murray Biscuit makes brokered sales is too generous), Morrison could take sales away from Feldman by charging those stores a lower price while still covering all of his (Morrison's) costs. Feldman would complain; but it would be as if a real estate broker complained that his principal was allowing another broker to sell the same property at a lower price. That would not make the brokerage agreement price fixing.

To answer a question about antitrust as about any other field of law it is always helpful and often essential to consider what the purpose of the law is. The purpose of antitrust law, at least as articulated in the modern cases, is to protect the competitive process as a means of promoting economic efficiency. See, e.g., *Broadcast Music, Inc. v. Columbia Broadcasting System,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979); *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc.,* 784 F.2d 1325, 1338 (7th Cir.1986); *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 266–67 (7th Cir.1984); *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.,* 682 F.2d 660, 663–64 (7th Cir.1982); *Westman Commission Co. v.*

*Hobart Int'l, Inc.,* 796 F.2d 1216, 1220 (10th Cir.1986); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 228–29 (D.C. Cir.1986). Efficiency would not be promoted by a rule that forbade principals to tell their agents at what price to sell the principal's product unless the agent was an employee. Principals would either convert their sales agents from independent contractors to employees or give their sales agents a discretion over price that the agents, for lack of information and expertise, would not be in a position to exercise intelligently. Neither result would further the goals of antitrust law; nor can it seriously be argued that the ancient and ubiquitous practice of principals' telling their agents what price to charge the consumer is just some massive evasion of the rule against price fixing. Brokerage is no more a device for evading the Sherman Act than is telling one's sales clerk what price to mark on a bag of sugar rather than letting him decide for himself.

■ Hence the cases allow a seller to tell his sales agents what price to charge. See, e.g., *Pink Supply Corp. v. Hiebert, Inc., supra; Victorian House, Inc. v. Fisher Camuto Corp.,* 769 F.2d 466, 469 (8th Cir. 1985); *Calculators Hawaii, Inc. v. Brandt, Inc.,* 724 F.2d 1332, 1336 (9th Cir. 1983). Of course, if the seller just constitutes his competitor a sales agent, this is an attempt to evade antitrust law by a label and must fail. See, e.g., *United States v. Masonite Corp.,* 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942). So too if the agent is really a dealer, as in the *Simpson* case; in such a case an agreement vesting pricing discretion in the supplier, as principal, may support an inference that the parties are using the language of agency to circumvent the restrictions that antitrust law places on a supplier's fixing his distributors' or dealers' resale prices. See *Calculators Hawaii, Inc. v. Brandt, Inc., supra,* 724 F.2d at 1336 n. 1; *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1030 n. 4, 1031 n. 5 (2d Cir.1979).

But what is a "dealer" or "distributor," as distinct from a "sales agent"? These terms are not self-defining; nor have they fixed meanings independent of the purpose of definition. The purpose in this case is to guide the application of the per se rule against resale price fixing ("resale price maintenance," "vertical" price fixing). Now that the Supreme Court has held that territorial and customer restrictions that serve the same economic purpose as resale price maintenance are illegal only if unreasonable (*Sylvania*), the rationale of the per se rule against resale price maintenance, though reaffirmed in *Sylvania* and later in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 102–03, 100 S.Ct. 937, 941–42, 63 L.Ed.2d 233 (1980), is unclear. Mainly, however, the Court seems worried that schemes of resale price maintenance may often reflect dealers' "horizontal" price-fixing conspiracies, with the manufacturer who fixes the dealers' prices being the dealers' cat's paw: he monitors compliance with the conspiracy and punishes defectors by cutting off their source of supply. See *id.* at 103 and n. 7, 100 S.Ct. at 942 and n. 7; *Continental T.V., Inc. v. GTE Sylvania Inc., supra*, 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18. Whatever the precise rationale, the rule against resale price maintenance presupposes that the middlemen—dealers or distributors—to which the rule applies have the capacity and incentive to set resale prices. Cf. *Marty's Floor Covering Co. v. GAF Corp.*, 604 F.2d 266, 269 (4th Cir. 1979). This in turn requires in the usual case that the middleman perform extensive functions in distribution, such as warehousing and delivery. If he is merely an order taker, his costs will be a trivial fraction of the total costs of the product, so that to make him determine the final price to charge the consumer would be telling the tail to wag its dog. On the other hand, the more functions in distribution the middleman performs, the less likely is the manufacturer to have the information he needs to set the final price.

No hard and fast line, therefore, can be drawn between the mere sales agent and the dealer or distributor, for these terms denote points, by no means fixed, on a continuum bounded at one end by the manufacturer's full-time employees and at the other by vast, autonomous distribution enterprises such as Sears Roebuck. Another complication (not relevant to this case, though) is that a sales agent may be hired precisely because of his expertise in determining market price; this is an important factor in the sale of private homes through brokers, but it does not turn a brokerage agreement into a price-fixing agreement. Still another complication comes from the fact that consignment agreements, in which a seller fixes the price at which his goods are sold by a dealer (not a mere broker or sales rep), are beyond the reach of the Sherman Act unless the agreement has the suspicious elements identified in the *Simpson* opinion. See *Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 342–43 (9th Cir.1983). Consignment selling, like selling through brokers, is a long-established, widespread, and clearly legitimate business practice—not just a device for circumventing the per se rule against price fixing. If such selling were unusual in the defendant's industry, an inference might arise that it had been adopted to get around the rule; perhaps that is the best explanation for the result in *Simpson*; but it has no application to this case.

So not only is the line between distributor and agent indistinct; distributors are permitted to operate as agents under consignment agreements not intended to circumvent the antitrust laws. But we need not try to plumb these mysteries any more deeply. It is plain where Feldman is on the continuum. He is a bona fide broker, far removed from a wholesale distributor who is called a broker in order to allow a manufacturer to do something it is forbidden to do with dealers outside the confines of lawful consignment selling—fix resale prices.

Some cases hold that if the agent is acting for his own purposes rather than those of the principal he may be capable of conspiring with the principal. See, e.g.,

*Pink Supply Corp. v. Hiebert, Inc., supra,* 788 F.2d at 1317. All that this means, however, is that the terms of the agency agreement do not always resolve the issue whether the antitrust laws have been violated. If the agent is acting not as an agent but as a principal, his formal contractual status won't save him (or his "principal") from antitrust liability. This is a perfectly sensible result but has no bearing on the present case.

Even if all this is wrong and Murray Biscuit could have violated the Sherman Act by fixing the price at which Feldman sold its products, Morrison could not maintain this suit unless his termination could be attributed to the agreement. If he would have been terminated anyway, the agreement was not a cause of his injury, and obviously he would not be entitled to damages or any other remedy for a violation that could not harm him. That is the case here. Morrison's agreement with Murray Biscuit forbade him to sell to Certified stores in Chicago at any price, and if that agreement is lawful—as for purposes of this case we must assume it is, since its legality is not challenged—it prevented him from competing with Feldman for the business of those stores at any price. When it is lawful to forbid all competition between two dealers (treating Feldman for the moment as a dealer), and when such a prohibition is in force, a limitation on price competition between the same dealers—a lesser limitation—can have no effect. Suppose that after *Sylvania* was decided, a seller that had a price-fixing agreement (illegal per se) with its dealers adopted a lawful customer allocation agreement pursuant to which it terminated a dealer. That dealer could not sue for price fixing, even if the price-fixing agreement had never been rescinded, unless he could show that his breach of the customer allocation agreement was not the real reason for his termination; maybe the agreement was a mask behind which the illegal price fixing continued. The reason for Morrison's termination was that he tried to take away a customer who had been assigned to Feldman; there is no indication that the assignment was a mask for resale price maintenance. Since Feldman had the exclusive right to sell Murray Biscuit's products to the Certified account, Morrison had no business selling to Certified at any price. Cf. *Local Beauty Supply, Inc. v. Lamaur Inc.,* 787 F.2d 1197, 1202 (7th Cir.1986). Although Morrison argues that his selling to Certified was merely a pretext for his termination, at the same time he argues that he was terminated on the complaint of Feldman. But Feldman could have no reason to complain about Morrison unless Morrison was trying to compete with him, which the assignment of customers agreement that Morrison concedes to be lawful forbade.

■ All this leaves unexplained the reference in the letter of termination to price cutting. But the mystery dissipates when we realize that Feldman would have had little or no cause for complaint if Morrison had been trying to sell to Certified at a higher price than he, or even at the same price, for at parity Feldman would have the edge simply because Certified was accustomed to dealing with him. To break in with a new customer Morrison had to offer a price cut. Feldman may have told Murray Biscuit not only that Morrison was violating the customer agreement by soliciting Certified but that the violation was hurting Feldman because Morrison was quoting a lower price, but it does not follow that Murray Biscuit was guilty of price fixing when it terminated Morrison at Feldman's request. As we held in *Valley Liquors, Inc. v. Renfield Importers, Ltd., supra,* 678 F.2d at 744, and more important as the Supreme Court held in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the fact that a supplier responds to a dealer's complaint about price cutting by terminating the price-cutting dealer does not prove price fixing. "[S]omething more than evidence of complaints is needed. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market."

*Id.* at 764, 104 S.Ct. at 1471. See also *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1468–69 (9th Cir.1986); *Westman Commission Co. v. Hobart Int'l, Inc., supra; Business Electronics Corp. v. Sharp Electronics Corp.*, 780 F.2d 1212, 1216–18 (5th Cir.1986); *National Marine Electronic Distributors, Inc. v. Raytheon Co.*, 778 F.2d 190 (4th Cir.1985). The violation of a lawful restriction on distribution, such as a reasonable customer allocation agreement, will manifest itself to the dealer who complies with the restriction as price cutting, for it is only by price cutting or some equivalent concession that a new dealer can take away the established dealer's customers. As long as the supplier's motive is not to keep his established dealers' prices up but only to maintain his system of lawful nonprice restrictions, he can terminate noncomplying dealers without fear of antitrust liability even if he learns about the violation from dealers whose principal or perhaps only concern is with protecting their prices.

We thus agree with the Fifth Circuit in *Business Electronics Corp. v. Sharp Electronics Corp., supra*, 780 F.2d at 1216–18, and the Tenth Circuit in *Westman*, that the mere fact that the dealer may be motivated by antipathy to price competition is irrelevant and that the contrary suggestion in *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir.1979), and cases following it, such as *Malley-Duff & Associates, Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 140–41 (3d Cir.1984); *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1015 (9th Cir.1983), and *Jayco Systems, Inc. v. Savin Business Machines Corp.*, 777 F.2d 306, 317–18 (5th Cir.1985), is unsound. See also *Valley Liquors, Inc. v. Renfield Importers, Ltd., supra*, 678 F.2d at 744. A dealer who has an exclusive territory or exclusive customers has, if the exclusive agreement is lawful, a contractual right to be free from the competition of other dealers in the same brand. But he also has the advantage of incumbency, so that (in the usual case) he need only fear the competition of a price-cutting newcomer. In his own mind, therefore, antipathy

to violations of the agreement and to price cutting will merge; and antitrust liability should not turn on a court's guess as to which motive may have predominated.

AFFIRMED.