**Greggar S. ISAKSEN, d/b/a Applewood Stove Works, Plaintiff,**

v.

**VERMONT CASTINGS, INC., a Vermont corporation, Defendant.**

**No. 85–C–882–S.**

United States District Court, W.D. Wisconsin.

Oct. 6, 1986.

Trayton L. Lathrop, Isaksen, Lathrop, Esch, Hart & Clark, Madison, Wis., for plaintiff.

Richard A. Hollern, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

In this antitrust action, defendant Vermont Castings, Inc. asks for relief from the judgment entered upon a jury verdict. The facts are as follows:

## FACTS

The background facts are simply stated. Plaintiff Gregor Isaksen, doing business as Applewood Stove Works from Poynette, Wisconsin, began selling wood stoves and accessories in 1975. In early 1982 he became an authorized dealer of defendant Vermont Castings, Inc., a Vermont manufacturer of wood burning stoves and accessories. Originally a direct mail order company, Vermont Castings began developing a dealer network which by 1982 accounted for about two-thirds of its business. By 1985 only 10 percent of its sales were direct. Vermont Castings has the largest share of the wood stove market in the United States and the Midwest, holding

shares of 8 percent and 10 percent, respectively.

From the beginning of the dealership arrangement plaintiff advertised throughout Wisconsin and neighboring states, emphasizing low prices for Vermont Castings stoves, prices which were below defendant's suggested retail prices. Although pricing decisions were explicitly left up to the judgment of individual dealers, defendant began receiving complaints about plaintiff's pricing practices from other dealers almost immediately. Defendant's response to complaining dealers consisted of, essentially, a denial that it had the power to stop such practices, although Vermont Castings had some sympathy for their plight.

However, the story did not end at that point, and plaintiff asserts that later actions of defendant against plaintiff's interests were in reality designed to force him to conform to the suggested retail price. The later relations between the parties will be discussed in the body of the opinion.

## MEMORANDUM

I. The first part of defendant's motion for judgment after the verdict attacks the legal and factual sufficiency of plaintiff's theory that plaintiff was an unwilling co-conspirator in a price fixing conspiracy when he brought his price up to the suggested retail price in the fall of 1983. Defendant's argument is based on the simple and persuasive proposition that the facts do not conform to the requirements of such a conspiracy set forth in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). The Court stated, at 1471 (n. 9), that:

> The concept of a "meeting of the minds" or "a common scheme" in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.

Since it is undisputed that plaintiff never told the defendant that he was raising his prices (whether to conform to defendant's implicit demands or otherwise), it is defendant's position that there was no communication of acquiescence as required by *Monsanto*.

■ Plaintiff's response is wholly unpersuasive. Basically, plaintiff argues that *Monsanto* did not explicitly hold that a distributor's actions in compliance with a demand would not constitute acceptance. It is true that there was no such explicit holding. However, plaintiff ignores both the implication of the above quoted language and the clearly articulated reason behind the evidentiary standard adopted by the Court:

> [I]t is of considerable importance that independent action by the manufacturer, and concerted action on non-price restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to per se treatment and treble damages. On a claim of concerted price-fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement. If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrines enunciated in [*Continental T.V. v. GTE*] *Sylvania* [*Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)] and [*U.S. v.*] *Colgate* [*& Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)] will be seriously eroded.

*Id.* at 1470. A factfinder may be justified in inferring a demand to comply with price restrictions through evidence of pricing complaints from other distributors and non-price retaliatory acts by the manufacturer. The jury here evidently did so. However, price complaints alone are clearly not enough. *Id.* at 1471. The remainder of the evidence of defendant's actions unconnected with price are certainly "highly ambiguous" inasmuch as there was evidence of continual misunderstandings and ill-feeling between plaintiff and defendant which, on defendant's part, may or may not have been related to pricing. Under such cir-

cumstances, the Court concludes that *Monsanto* demands a clearly communicated acquiescence in defendant's suggested price before plaintiff can be said to have established a price-fixing conspiracy. Unless either the manufacturer's demand or the distributor's acquiescence is explicit, the evidence of a conspiracy is simply too tenuous to allow an award of treble damages under the antitrust law. Plaintiff here was never told by defendant to raise prices or suffer consequences, and plaintiff never told the defendant that he was raising his prices because he understood that to be defendant's demand. When it is at least debatable that a manufacturer does not mean to demand compliance with a suggested price, and plaintiff must admit that it is debatable here, the Supreme Court's requirement of a communicated acquiescence must be read literally to avoid the risk that a conspiracy will be inferred where none exists. It is not asking too much of an antitrust plaintiff to comply with this dictate since the proof of a conspiracy will be entirely within his power to produce in the circumstances illustrated by this case.

■ Nor can plaintiff successfully argue that there was a contract, as opposed to a conspiracy, for there is clearly no meeting of the minds produced by uncommunicated acceptance of an ambiguous offer. To rule otherwise would be to judicially create a contract at the whim of one party while the other party had no intention of being bound. None of the authority cited by plaintiff supports the proposition that an ambiguous offer, followed by performance without explicit acceptance, constitutes a contract.

Accordingly, no price-fixing conspiracy between the plaintiff and defendant was ever established. Therefore, plaintiff cannot recover on this theory.

■ II. Plaintiff's other theory of recovery is no less problematical, and the Court concludes that the evidence is insufficient to establish a price-fixing conspiracy between defendant and its other distributors.

As *Monsanto* made clear, something more than evidence of complaints about plaintiff's pricing practices by other distributors is necessary:

> There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently.

104 S.Ct. at 1471. As later rephrased in *Matsuishita Elec. Indus. Co. v. Zenith Radio*, —— U.S. ——, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986):

> [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.

The weight of this burden was recently illustrated by the Court of Appeals in *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430 (7th Cir.1986). The letter terminating the antitrust plaintiff in *Morrison* actually cited price cutting as one of the reasons for termination and was clearly induced by a competitor's complaint. Nevertheless, the Court determined that the evidence was insufficient to support the existence of a price-fixing agreement. The facts of *Morrison* are clearly distinguishable, but the Court's analysis is not altogether inapplicable here, as will be shown below.

A review of what evidence, other than the complaints of other dealers, plaintiff presented is in order. Early in the relevant period, defendant expressed some concern to plaintiff that his pricing policies were out of the ordinary. Also, shortly after being granted a dealership plaintiff was assured that for purposes of areas of primary responsibility plaintiff would be given access and promotional assistance in the Madison, Wisconsin area and that a competing dealer south of Madison (in Janesville) did not intend to exploit that territory. However, defendant's promotional efforts in 1982 were geared to zip code areas, and plaintiff's competitor received assistance in the area surrounding Madison (although not in the City itself, which had zip codes assigned to plaintiff). Plaintiff objected to this assignment and was told that defendant was unable to divide mailings more

specifically than by the first three digits of the zip codes. This was unsatisfactory to plaintiff, and he declined to participate in a similar program the next year. Plaintiff's name was also left off several lists of dealers contained in the defendant's publication "Owner's News" which was sent to all known owners of defendant's products. Most importantly, in 1983 defendant undertook a promotional campaign known as "Close the Loop" where potential customers who responded to company advertising were directed to dealers in their area. Plaintiff received few such referrals, but plaintiff's main competitor from Janesville (who had opened a shop in Madison with defendant's assistance) received hundreds of such referrals, including some who were very close to plaintiff's shop in Poynette. Finally, plaintiff requested that defendant drop-ship woodstoves to a branch store that plaintiff unilaterally opened in Superior, Wisconsin. Defendant refused to ship stoves to this store (instead shipping them to Poynette) on the ground that plaintiff needed the Company's permission to open a new store, and that plaintiff's Superior manager was a dealer with whom the defendant had previously refused to deal.

Defendant argues, and presented some evidence at trial, that it had a legitimate reason to be concerned with dealer's profit margins. The reason was that its dealers needed sufficient profits to promote the company's products. The defendant was also concerned that plaintiff's advertising of low prices in the areas served by other dealers created a "free rider" problem where a dealer's customer service efforts would be undercut, and rendered useless, by plaintiff's lower price. The defendant also argued that its dealer contract reserved the right to assign areas of primary responsibility in its own best interest, and that some of the problems with leaving plaintiff's name off some promotional materials were the result of accident or misunderstanding.

It is clearly legitimate for a manufacturer to protect its dealers against free riders. *Monsanto*, 104 S.Ct. at 1470; *O.S.C. Corp. v. Apple Computer*, 792 F.2d 1464, 1468 (9th Cir.1986). While the evidence was scant that plaintiff had profited from free riding, it is clear that the threat was manifest. Concern with dealer profit margins is equally blameless inasmuch as defendant was phasing out its direct sales activities and needed a strong dealer network to retain its market share. The exchange of information on this subject does not subject the manufacturer to an inference of price-fixing. *Monsanto*, 104 S.Ct. at 1470.

The *Apple Computer* case cited above provides an excellent illustration of the kind of problem presented by this case. The Court cited the following evidence of record in that case as insufficient to support the inference of a price-fixing agreement where price cutting mail order dealers were terminated:

> The dealers' evidence of a price-fixing conspiracy consisted of the (1) complaints to Apple about mail order dealers' price discounts; (2) the outright and sudden elimination of mail order sales and termination of those dealers who continued such sales; (3) several meetings involving dealer and manufacturer representatives in which mail order discounting was allegedly raised; (4) a conversational statement by Apple's president that while he could not legally discuss pricing, something was going to be done about price erosion; (5) an incident in which Apple allegedly coerced mail order dealers to "get their prices up;" (6) Apple's alleged conditioning of new locations for mail order dealers upon their agreement to cease discounting; and (7) Apple's alleged agreement with one of the plaintiffs to not advertise prices.

792 F.2d at 1468. Clearly, this is a much stronger case than plaintiff was able to produce. The Court noted the same principles cited by this Court from *Monsanto*. The Court pointed out that Apple representatives discouraged price discussions at dealer meetings much the same way that defendant here told complaining dealers that it could do nothing about plaintiff's pricing. The Court concluded that the defendant's remark about "price erosion"

was "entirely consistent with a manufacturer's right to invoke vertical non-price restraints that 'ensure that its distributors earn sufficient profit to pay for [desired] programs.'" *Id.* at 1469, citing *Monsanto.*

If all of this were not enough to dispel any inference of a conspiracy to fix prices, there is the fact that defendant simply had no motive to enter into such a conspiracy. *Matsushita* teaches that the lack of economic incentive to enter into an antitrust conspiracy is probative and compelling evidence that no such conspiracy existed:

> It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

106 S.Ct. at 1356. Defendant's concern for its own economic benefit simply had to have been confined to volume, since it sold its product to the dealers without price discrimination, and it was phasing out its own direct sales program. Therefore, the defendant had no reason to punish a dealer who sold at low prices except insofar as such price cutting impacted upon other areas of legitimate concern to the company. The higher prices which would be the result of such a conspiracy would ordinarily be expected to cut into that volume. Defendant had no apparent reason to wish such a result. As the Court of Appeals pointed out in *Murray Biscuit,* 797 F.2d at 1439–40, a problem of legitimate concern to the manufacturer will often manifest itself as a price complaint from another dealer. This does not necessarily mean that the action taken by the manufacturer in response to such a complaint amounts to price fixing. Yet that is the conclusion plaintiff urged upon the jury and the jury succumbed to these blandishments.

Accordingly, the verdict cannot stand, and defendant is entitled to judgment notwithstanding the verdict.

■ III. The above conclusion makes it unnecessary to address defendant's argu-ments in support of a new trial. The Court does note, however, that defendant would be entitled to a new trial on damages as the damage verdict was clearly excessive. While there is nothing inherently wrong with comparing profits before and during the wrongful actions of an antitrust defendant, a plaintiff must offer some foundation that the periods were otherwise comparable. Plaintiff did not do so here. Further, there was not any attempt at all to show how the reduced profits were caused by defendant's allegedly illegal activities. The conclusion was almost inescapable that plaintiff's lower profits during the relevant period before trial were, at least in significant part, the result of industry-wide depressed conditions and what amounted to distress sales by plaintiff which were not attributable to defendant's actions. Finally, given plaintiff's right to equitable relief upon success in this lawsuit and the fact that plaintiff could not ground his losses on increased competition from other dealers, future losses were, to say the least, extraordinarily speculative. The Court concludes that plaintiff simply failed to prove antitrust damages in an amount anywhere near those awarded by the jury. *See,* generally, *MCI Communications v. AT & T,* 708 F.2d 1081, 1160–69 (7th Cir.1983), *cert. den.,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226.

## ORDER

IT IS ORDERED that defendant's motion for judgment notwithstanding the verdict is GRANTED.

Let judgment be entered accordingly, with costs to the defendant.