**W.H. BRADY CO., Plaintiff,**

v.

**LEM PRODUCTS, INC., Defendant.**

**No. 76 C 3444.**

United States District Court,
N.D. Illinois, E.D.

April 30, 1987.

---

See also, 521 F.Supp. 676.

Michael K. Murtaugh, Martin R. Greenstein, Baker & McKenzie, Chicago, Ill., for plaintiff.

Thomas J. Reed, Allen & Reed, Chicago, Ill., Thomas M. Ferrill, Jr., John W. Logan, Jr., Allen V. Hazeltine, Ferrill & Logan, Willow Grove, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Plaintiff W.H. Brady Co. ("Brady") and defendant Lem Products, Inc. ("Lem") both manufacture wire marking systems. In its complaint, Brady contends that Lem has infringed and continues to infringe Brady's trademarks in the color blue, which Brady uses on its wire marker cards, and in the alpha-numeric designations B–184 and B–500, which Brady uses to designate certain aluminum foil and vinyl cloth wire markers. According to Brady, such infringement violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), common law trademark infringement and unfair competition principles, the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, § 312, and the Illinois Anti-Dilution Act, Ill.Rev.Stat. ch. 140, § 22. In its counter-complaint, Lem claims that Brady brought this action for an anticompetitive purpose, and that Brady has monopolized or attempted to monopolize, and has engaged in unlawful price discrimination in, the market for pressure-sensitive, card-mounted wire markers in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 2(a) of the Clayton Act, 15 U.S.C. § 13(a).

This action came before the court for a bench trial in October, 1982. The court has reviewed the pleadings and arguments of counsel, the testimony of the witnesses, all the exhibits received in evidence, and the court's very detailed contemporaneous trial notes, which include an appraisal of the credibility of each witness. In determining the credibility, and the weight to be given the testimony, of each witness, the court has taken into account for each the intelligence, the ability and opportunity to observe, the age, the memory, the manner while testifying, any interest, bias or prejudice the witness may have, and the reasonableness of the testimony considered in light of all the evidence in the case. The court has drawn reasonable inferences from all of the evidence, and has evaluated the legal arguments of the parties. Based on all of the evidence and arguments, and pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

## I. Factual Background

### A. The Parties

Brady is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. Brady is one of the largest manufacturers and sellers of identification materials of all types, with offices throughout the United States and in many foreign countries. In addition to wire marking systems, Brady manufactures signs and sign-making materials, warning and directional markers and nameplates. With regard to wire markers specifically, Brady manufactures or markets pressure-sensitive card-mounted, computer-generated, clip-on molded plastic, heat-shrinkable slip-on, encapsulated, photosensitive tape and hot stamping wire markers.

Lem is a Pennsylvania corporation with its principal place of business in Doylestown, Pennsylvania. Robert L. Klumpp, the president and secretary and a director of Lem, and Ray W. Trautlein, the treasurer and a director of Lem, founded Lem in 1967 with very limited capital. Klumpp worked for Brady during 1960, and worked for Stranco Products, Inc. ("Stranco"), another wire marker manufacturer, from 1962 until 1967. Trautlein worked for Brady from February, 1958 through December, 1960, and worked for Stranco from 1961 through 1966. Lem manufactures

card-mounted, pressure-sensitive wire markers, tape cable markers, voltage markers, and other electrical and industrial markers.

### B. The Wire Marker Cards

Card-mounted, pressure-sensitive wire markers, the subject of this suit, consist of stiff cards two inches wide by nine inches long upon which are releasable, numbered, narrow strips of tape. Western Lithograph Co., later succeeded by Thomas & Betts Co. ("Thomas & Betts"), began manufacturing and marketing such markers in 1942. Brady and Stranco began manufacturing such markers in 1944 and 1956, respectively. North Shore Name Plate Co. also manufactured card-mounted, pressure-sensitive wire markers for a time, but was no longer in the business when Lem began to manufacture such markers in 1968. Panduit Corp. ("Panduit") began manufacturing card-mounted, pressure-sensitive wire markers in 1979.

In 1948, Brady adopted the color blue as its "corporate color," emphasizing the color blue in the majority of its literature and packaging. Brady developed a special release coating for its wire marker cards in 1953, dyed the release coating blue, and adopted the trademark "Blue Streak" to identify its wire marker cards having the special release coating. Brady owns two federal trademark registrations for the mark "Blue Streak," and places a registered trademark symbol on each card with the Blue Streak release coating. In 1959, Brady began manufacturing wire marker cards with the entire top side colored blue; however, Brady never indicated, on its cards, or in its catalogs and promotional material, that it regarded the blue background color as a trademark, and Brady did not apply for registration of a trademark in the blue background color until after it filed this suit.[1] Also, since 1973, Brady has manufactured self-extinguishing wire markers on bright red cards under the trademark "Fire/Chek," although sales of these markers have been very low and

Fire/Chek markers are no longer offered in the standard Brady line. Brady also manufactures special Datab wire markers, which are adapted for use in typewriters and computer printers and are mounted on thin paper liners of tan/brownish color.

Since the time Lem's wire marker cards entered the market in 1968, Lem has used blue card stock for such markers. When Lem selected the color blue for its cards, it was aware that Brady had been manufacturing blue wire marker cards for several years; however, Lem did not regard such use as a trademark or exclusive right of Brady. Lem selected blue because it is considered a pleasant, psychologically positive color in the electrical industry.

As for other wire marker manufacturers, Thomas & Betts mounted its wire markers on green cards for many years until approximately 1981, when it began mounting its wire markers on orange cards. Stranco has for several years used pink card stock for its wire marker cards; however, Stranco uses the color blue for its wire marker book covers and its wire marker literature. Since it began making its own cards in 1979, Panduit has made blue wire marker cards.

Lem, Brady and Stranco have, over the years, supplied various companies in the electrical industry with private label wire markers. Lem supplied such cards to Gardner-Bender Co. from 1971 until 1975, and to Panduit from approximately 1977 until 1979. Also, Lem has supplied and continues to supply such cards to AMP Products, Inc. All private label cards Lem supplied and continues to supply are blue. Brady, since 1975, has supplied private label wire markers to Gardner-Bender Co. Brady supplied Gardner-Bender Co. with blue cards until 1982, when it switched to red cards. Stranco manufactures pink private label wire marker cards for Ideal Industries.

Brady's wire marker cards, with few exceptions, identify Brady as the manufactur-

---

1. The United States Patent and Trademark Office suspended Brady's application for a trademark in the color blue as applied to wire mark-

er cards pending the outcome of this lawsuit. *See* Lem Exhibit ("DX") 256; Trial Transcript ("Tr.") of October 26, 1982 at 224–25.

er on the card. Also, unlike almost all other wire marker cards, Brady's cards had rounded corners until 1982, when Brady switched to the pervasive square-cornered cards. All wire marker cards manufactured by Lem, with few exceptions, have Lem's name printed on the front side of the card. Stranco prints its name and any trademark or other information on the front of its wire marker cards. Ideal Industries' private label cards identify Ideal Industries as the distributor on the front and reverse sides of the cards, and identify Stranco as the manufacturer of the cards on the reverse side.

### C. The Alpha-Numeric Symbols

For many years, Brady has indicated the various materials of which its wire markers are made with alpha-numeric symbols, combining the letter "B" with a two-digit or three-digit number. Brady uses the symbols in its sales literature and also imprints the symbols directly on its wire marker cards and other products. Brady has never indicated that it considers the symbols as trademarks, and has never applied for registration of any of the symbols as a trademark. Brady uses the symbol B–184 to designate wire markers made of aluminum foil, and uses the symbol B–500 to designate wire markers made of vinyl cloth.

Beginning in 1975, Lem used alpha-numeric symbols in its printed price list, combining the letter "L" with a two-digit, three-digit or four-digit number, to designate the various materials of which its wire markers are made. Lem chose "L" because it is the initial letter of the company name. Many of the symbols in Lem's price list had no Brady counterpart; however, the symbol L–184 designated aluminum foil wire markers, and the symbol L–500 designated vinyl wire markers. Lem never printed these symbols on any of its wire marker cards or other products, or on the packaging or cartons therefor. Also, Lem never used the symbols B–184 and B–500, and never used the numbers 184 and 500 without the "L" prefix.

In a series of letters during 1975 and 1976, Brady protested Lem's use of L–184 and L–500, contending that Brady had a right to exclusively use the symbols 184 and 500. Lem denied that Brady had such a right, but, on November 18, 1976, ten days after Brady served the complaint in this action on Lem, Lem sent Brady a certified letter informing Brady that Lem would no longer use the symbols L–184 and L–500 in its price lists. Lem has not used these symbols since that time. Significantly, Brady did not protest Lem's use of the color blue in the 1975–1976 letters. In fact, Brady did not object to Lem's use of blue at all until it filed the complaint in this action on September 16, 1976, although Brady became aware of Lem's use of blue as early as 1971.

### D. The Success and Marketing Techniques of Brady and Lem

With regard to card-mounted, pressure-sensitive wire markers only, and no other type of wire marker, Brady manufactures and sells just over fifty percent of the total amount manufactured and sold. Thomas & Betts manufactures and sells approximately thirty-three percent, Stranco manufactures and sells approximately six percent, and Lem manufactures and sells approximately three percent of all card-mounted, pressure-sensitive wire markers. *See* Lem Exhibit ("DX") 302A. During the period from 1974 through 1978, Brady's share of the sales of card-mounted, pressure-sensitive wire markers slightly decreased, while that of Lem slightly increased.

One of the marketing techniques Brady uses to sell its wire marker cards is the "blanket contract." Under a blanket contract, Brady guarantees that a purchaser will be able to buy wire markers at a certain price for a fixed period of time, usually for a year, provided the purchaser buys a stated quantity of cards during the year. The blanket contracts do not prohibit the purchaser from buying wire markers from other sources during the contract period. During the period from 1974 through 1976, the number of Brady blanket contracts increased from nine to thirteen.

As part of its wire marker product line, Brady leases to customers its patented

"Markermatic" machine. The Markermatic automatically and rapidly takes wire marker tape from a card and applies a marker to a wire. Over the years, Brady has leased up to sixty Markermatics to its customers. The Markermatic leases do not require lessees to use only Brady or Brady-approved wire marker cards in the Markermatic. Rather, the leases require Markermatic lessees to use only cards which will not "jam" or damage the machine, and state that the lessees shall be liable to Brady for damages resulting from the use of incompatible cards. Also, in the leases, Brady agrees to analyze cards for compatibility at the request of the lessee. Brady does not state in the Markermatic leases that Lem and Stranco wire marker cards are suitable for use in the Markermatics. However, there was no evidence at trial that Brady has ever disapproved of the use of Lem or Stranco cards, or any other wire marker cards, in its Markermatics.

Although Lem does not utilize blanket contracts, Klumpp testified at trial that he has attempted to enter into blanket contracts with at least two customers, and that he would use blanket contracts if he could. *See* Trial Transcript ("Tr.") of November 22, 1982 at 38. Lem does enter into exclusive dealership contracts with its distributors, requiring those distributors to market only Lem wire marker cards.

## II. Trademark Infringement

Brady contends that Lem has infringed Brady's common law trademark in the color blue as used on Brady's wire marker cards, and in the symbols B–184 and B–500. According to Brady, Lem's use of the color blue and Lem's now discontinued use of the symbols L–184 and L–500 in its price lists violates Section 43(a) of the Lanham Act, Illinois common law trademark infringement and unfair competition principles, the Illinois Deceptive Trade Practices Act, and the Illinois Anti-Dilution Act.

### A. Section 43(a) Of The Lanham Act

Congress provided for national protection of trademarks in the Lanham Act of 1946 in order to secure to a trademark owner the good reputation of his business and to protect the ability of consumers to distinguish among competing producers. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105 S.Ct. 658, 664, 83 L.Ed.2d 582 (1985). *See also Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir.1986) (the goal of trademark protection is to enable a consumer to identify a brand with ease and speed and therefore to facilitate competition); *W.T. Rogers v. Keene*, 778 F.2d 334, 338–39 (7th Cir.1985); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429–30 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

Section 43(a) of the Lanham Act prohibits the making of "a false designation of origin, or any false description or representation, including words or symbols tending falsely to describe or represent the same...." The purpose of a trademark, registered or common law, is to designate the origin of goods; therefore, infringement of a trademark is actionable under Section 43(a), provided Section 43(a)'s requirements are met. *W.T. Rogers*, 778 F.2d at 337.

There are two basic requirements under Section 43(a). First, the plaintiff must demonstrate that the trademark is valid, in other words, distinctive enough to warrant protection. *Liquid Controls, Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939 (7th Cir.1986); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986). A generic term, a term commonly used as the name or description of a kind of goods, can never function as a trademark. *Liquid Controls*, 802 F.2d at 935; *Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir.1984); *Walt-West Enterprises, Inc. v. Gannett Co., Inc.*, 695 F.2d 1050, 1056 (7th Cir.1982); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). A merely descriptive term, a term which describes a characteristic of a product, may serve as a trademark if it has developed a secondary meaning linking the product with its source

in the mind of the consuming public. *M-F-G Corp. v. EMRA Corp.*, 817 F.2d 410, 411 (7th Cir.1987); *Technical Publishing*, 729 F.2d at 1139; *Miller*, 561 F.2d at 79. A suggestive term, a term which suggests an ingredient or characteristic of the product, and arbitrary or fanciful terms may serve as trademarks without proof of secondary meaning. *Technical Publishing*, 729 F.2d at 1139; *Miller*, 561 F.2d at 79.[2]

■ A feature of the design of the product itself, such as the product's shape, color or pattern, may serve as a trademark if the feature is distinctive or has acquired a secondary meaning, and is nonfunctional. *Vaughan Manufacturing Co. v. Brikam International, Inc.*, 814 F.2d 346, 350 (7th Cir.1987); *Blau*, 781 F.2d at 608–09; *W.T. Rogers*, 778 F.2d 334. *See also Ambrit, Inc. v. Kraft, Inc.*, 805 F.2d 974, 978 (11th Cir.1986). Such features, together with the packaging of the product, are identified as "trade dress." *Blau*, 781 F.2d at 608; *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2nd Cir.1985) ("trade dress" may refer to a product's packaging or to the appearance of the product itself). *See also American Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1140–41 (3d Cir. 1986). A trade dress feature is functional, and therefore not protectible as a trademark, when other manufacturers of the product would have to include that feature as part of their products in order to be able to compete effectively in the market. *Vaughan*, 814 F.2d at 350; *W.T. Rogers*, 778 F.2d at 346. A feature may serve an aesthetic function, making the product more pleasing to the consuming public which is not indifferent to such things. However, the fact that a feature makes a product more attractive does not automatically mean that the feature is "functional" and may not attain trademark status; if effective competition is possible without copying the attractive feature, it may serve as a trademark. *W.T. Rogers*, 778 F.2d at 343. In suits under the Lanham Act, func-

tionality is a defense which the defendant must prove. *Id.* at 338.

■ Once one asserting infringement of a common law trademark has demonstrated the validity of the trademark, he must then establish the second requirement under Section 43(a): likelihood of confusion on the part of the consuming public. *See Blau*, 781 F.2d at 610 ("[A] court doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark.") Likelihood of confusion is a question of fact, and, in deciding whether there is or has been a likelihood of confusion, the court must consider the distinctiveness or strength of the marks, the similarity of the marks, products, channels of distribution, and advertising media used, the intent of the alleged infringer, and any evidence of actual confusion. *Ziebart International Corp. v. After Market Associates, Inc.*, 802 F.2d 220, 226 (7th Cir.1986); *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167–68 (7th Cir.1986); *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 354–60 (7th Cir.1983); *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1024–25 (7th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). None of the above factors, by itself, is dispositive of the likelihood of confusion question. *McGraw-Edison*, 787 F.2d at 1168. However, of the factors, similarity of the marks, intent of the alleged infringer, and evidence of actual confusion are considered "the more important" factors. *Ziebart*, 802 F.2d at 226.

If the party asserting infringement of a common law trademark cannot satisfy Section 43(a)'s first requirement, in other words, cannot demonstrate the trademark's validity, he is not completely without recourse. Section 43(a) may still protect his use of the mark against "passing off." *Liquid Controls*, 802 F.2d at 939; *Blau*, 781 F.2d at 611. " 'Passing off' means fraud; it means trying to get sales from a

---

**2.** The Seventh Circuit has recently emphasized that trademark analysis should focus on the function of the trademark, rather than on whether the mark is generic, descriptive, arbi-

trary or suggestive. *Scandia Down*, 772 F.2d at 1431 n. 3; *Walt-West*, 695 F.2d at 1057. *See also Blau*, 781 F.2d at 608 ("Labels should not determine rights.").

competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *Blau,* 781 F.2d at 611.[3]

### 1. The Color Blue

The court finds that Brady has failed to establish that it has a valid common law trademark in the blue surface of its wire marker cards. Also, although the court need not reach this question, *Blau,* 781 F.2d at 610, the court finds that Brady failed to show that Lem's use of blue on its wire marker cards has created a likelihood of confusion on the part of wire marker purchasers.

Brady claims that it holds a common law trademark in the overall surface color of one of its products, the wire marker card. In *Life Savers Corp. v. Curtiss Candy Co.,* 182 F.2d 4, 9 (7th Cir.1950), a case decided after the passage of the Lanham Act, the Seventh Circuit stated that a party may not monopolize a color in order to distinguish a product, except in connection with an arbitrary symbol or design. The court, quoting *Campbell Soup Co. v. Armour & Co.,* 175 F.2d 795, 798 (3d Cir.), *cert. denied,* 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949), pointed to the limit of the number of available colors as one reason for such an abso-

lute prohibition on trademarkability. *Life Savers,* 182 F.2d at 9. Another reason for the general rule that color, per se, is not trademarkable, is the desire that infringement actions not denigrate into questions of shade confusion. *See generally* McCarthy, *Trademarks and Unfair Competition,* § 7:16 (1973).

Brady claims a trademark solely in the surface color of its wire marker cards; it does not assert a trademark in blue plus any other symbol or design feature. Although this court believes that the overall color of a product, in certain circumstances, should be trademarkable, *see In re Owens-Corning Fiberglas Corp.,* 774 F.2d 1116 (Fed.Cir.1985),[4] it is bound to follow the law of the Seventh Circuit as set forth in *Life Savers.*[5] Therefore, the court finds that Brady cannot demonstrate a valid common law trademark in the overall color of its wire marker cards.

Further, the court finds that Brady has failed to establish that Lem's use of blue on its wire marker cards creates a likelihood of confusion in the minds of wire marker purchasers. The shade of blue Lem uses is similar to the shade Brady uses, and the products, distribution chan-

---

3. Brady has not alleged or presented any evidence that Lem attempted to pass itself off as a Brady distributor. *See* Tr. of October 25, 1982 at 85–86.

4. Even if color, per se, were trademarkable in the Seventh Circuit, the court would still find that Brady does not have a valid common law trademark in the color of its wire marker cards. First, the court finds that blue serves an aesthetic function, making the wire marker cards more pleasing to corporations that buy, and persons who apply, wire markers. However, wire marker card manufacturers do not have to color their cards blue in order to compete effectively in the market. *W.T. Rogers,* 778 F.2d at 346. Indeed, the manufacturers can and do use other colors, and neither party presented testimony that blue is the only, or the most, attractive color for wire marker cards, or that all available and attractive colors and color combinations have been appropriated by wire marker card manufacturers. Therefore, aesthetic functionality would not bar Brady from obtaining the trademark protection it seeks.

 However, the court finds that Brady has failed to demonstrate that blue has acquired a second-

ary meaning. In determining whether a mark has acquired a secondary meaning, the court must be "chiefly concerned" with the attitude of purchasers toward the mark. *Ideal,* 612 F.2d at 1023. Brady presented no testimony from wire marker purchasers or survey results indicating that the purchasers associate blue with Brady's cards. Instead, there was evidence that, from 1975 until 1982, Brady itself supplied blue wire marker cards to Gardner-Bender Co. for distribution under the Gardner-Bender private label. There was also evidence that Stranco uses blue for the cover of its wire marker books and its wire marker literature, and Brady manufactures non-blue wire marker cards. The court, based on all of this evidence, and the lack of evidence concerning purchasers' attitudes, finds that Brady failed to establish a secondary meaning linking blue wire marker cards with Brady in the minds of wire marker purchasers.

5. The Seventh Circuit has recently stated that trade dress may include a product's color. *Vaughan,* at 348 n. 2; *W.T. Rogers,* 778 F.2d at 337. However, in neither case does the court mention or distinguish *Life Savers* or state that color per se may constitute a valid trademark.

nels and advertising media are similar. However, Brady's alleged mark is extremely weak, and Brady produced no evidence that Lem chose blue intentionally to confuse wire marker purchasers or that such purchasers were actually confused as a result of Lem's use of blue. Lem knew, when it began producing the blue wire marker cards, that Brady manufactured blue cards; however, Lem chose blue solely because it is considered a pleasant color in the electrical industry. Brady presented no purchaser testimony, survey results or other evidence that wire marker purchasers were or are actually confused between Lem and Brady cards because Lem manufactures blue wire marker cards. Lem, on the other hand, presented evidence at trial that it prints its name on all of its wire marker cards and sales literature, including catalogs, with few exceptions, and that it deals with sophisticated corporate purchasers who are well aware of the fact that Lem manufactures its own wire marker cards. Based on this evidence, the court finds that Brady failed to establish a likelihood of confusion.

### 2. The Alpha-Numeric Symbols B–184 and B–500

Brady contends that the symbols B–184 and B–500, which Brady uses to refer to its wire marker cards made of aluminum foil and vinyl, respectively, are valid trademarks. It is clear that, under *Ideal*, 612 F.2d 1018, these symbols are merely descriptive terms which may attain trademark status upon proof of secondary meaning. According to Brady, these symbols have attained secondary meaning, and Lem's use of the symbols L–184 and L–500 created a likelihood of confusion. Brady requests damages and injunctive relief.

■ This court now denies Brady's trademark infringement claim based on Lem's use of the symbols L–184 and L–500 for the reason that Brady has not established a valid common law trademark or a likelihood of confusion. Brady has failed to establish that the symbols B–184 and

B–500 have acquired a secondary meaning. Brady uses the symbols in its sales literature and catalogs which it distributes to a limited audience: sophisticated wire marker purchasers in the electrical industry. Brady produced no evidence regarding the attitudes of these purchasers toward the symbols B–184 and B–500; no wire marker purchasers testified, nor did Brady introduce any survey evidence showing that wire marker purchasers link the symbols B–184 and B–500 with Brady wire marker cards.[6]

Brady also has failed to show that Lem's use of the symbols L–184 and L–500 created a likelihood of confusion. The only evidence Brady produced regarding likelihood of confusion was a group of selected Lem purchase orders on which certain long-term Lem customers used the symbols B–184 and B–500 instead of the symbols L–184 and L–500 to indicate the type of wire marker desired. Lem presented evidence that the customers which mistakenly used the symbols B–184 and B–500 in their purchase orders clearly knew that they were ordering wire marker cards manufactured by Lem and not Brady. According to Lem, all of its customers received catalogs identifying Lem as a manufacturer, and Lem telephoned to clarify that it was the manufacturer whenever an order mentioned a competitor's name or product. *See* Tr. of November 4, 1982 at 614–19; Tr. of November 5, 1982 at 735–40.

Brady presented no evidence in rebuttal; Brady failed to call any wire marker purchasers and failed to produce survey evidence showing that Lem's use of the symbols L–184 and L–500 created a likelihood of confusion in the "minds" of the sophisticated corporate wire marker card purchasers. Although the symbols are similar, as are the distribution and marketing channels, Brady's alleged mark is very weak, and Lem's brief use of the symbols L–184 and L–500 in its price lists was not intended to confuse purchasers regarding the source of the wire marker cards.

---

**6.** Although consumer survey evidence is not required in order to succeed on a motion for a preliminary injunction, *Vaughan,* at 349; *A.J. Canfield,* 796 F.2d at 908, the court finds that the complete absence of survey or other evidence of consumer attitude at the trial on the merits of this action demonstrates a lack of secondary meaning.

Furthermore, as stated earlier, Lem used the alpha-numeric symbols L–184 and L–500 in its price lists only for a brief period during 1975 and 1976. After Brady served Lem with the complaint in this case, Lem informed Brady that it would no longer use these symbols in any way. Lem has not used these symbols since that time, now ten years ago.

In *Schutt Manufacturing Co. v. Riddell, Inc.*, 673 F.2d 202 (7th Cir.1982), the alleged trademark infringer discontinued its use of the term "Full Cage" on football face masks one year before the company which owned the trademark registration for that term filed suit for damages and injunctive relief. The district court granted summary judgment denying the plaintiff's claims for damages and injunctive relief, and the Seventh Circuit affirmed. The Seventh Circuit held, first, that a party seeking damages must not only show likelihood of confusion, "but must demonstrate that it has been damaged by actual consumer reliance" on the misleading mark. *Id.* at 206. According to the *Schutt* court, a party may show damages from actual consumer reliance with evidence of actual diversion of sales or with testimonial or survey evidence of actual consumer deception. *Id.* at 207. Second, the Seventh Circuit held that the trial court has discretion to grant or deny an injunction against conduct which has ceased and is not likely to recur. *Id. See M–F–G,* at 411 (voluntary discontinuation of infringing conduct may make injunction unnecessary if little likelihood of recurrence).

■ Although it need not reach this issue, the court, in its discretion, also denies Brady's claim for damages and injunctive relief under *Schutt.* Brady presented no evidence that it was damaged by actual consumer reliance on Lem's use of the symbols L–184 and L–500. Also, Brady failed to present any evidence that Lem's use of the symbols L–184 and L–500 is likely to recur.

**B. Illinois Common Law and Statutory Claims**

Given that Brady has failed to establish that Lem's use of blue and the alpha-numeric symbols created a likelihood of confu-

sion, the court finds Brady is not entitled to relief under Illinois common law infringement and unfair competition principles, *Ziebart,* 802 F.2d at 228, and under the Illinois Deceptive Trade Practices Act, *McGraw-Edison,* 787 F.2d at 1173–74.

■ In order to prevail under the Illinois Anti-Dilution Act, the prior user must show that the alleged mark is distinctive and that the subsequent user diluted that distinctiveness. *McGraw-Edison,* 787 F.2d at 1174; *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1157 (7th Cir.), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984). In determining the distinctiveness of an alleged mark, the court should look to whether the mark is arbitrary, the length of time the first user has employed the mark, the scope of the first user's advertising, the nature and extent of the first user's business, and the scope of the first user's reputation. *Hyatt,* 736 F.2d at 1158. In determining whether a subsequent user has diluted an alleged mark, the court should look to the similarity of the marks and the extent of the subsequent user's marketing efforts. *Id.*

■ Brady has failed to show the distinctiveness of its claimed common law trademarks. Brady has manufactured blue wire marker cards and has used the symbols B–184 and B–500 in its promotional material and catalogs, and on its wire markers for years. However, other companies have used the color blue, Brady's advertising in the small and sophisticated wire marker consumer market has been limited, and the alleged marks are not arbitrary and unique but are extremely weak. Therefore, the court finds that Brady may not recover under the Illinois Anti-Dilution Act.

**III. Antitrust Violations**

Approximately one and one-half years after Brady filed its complaint in this action, Lem filed an amended answer and counterclaim alleging for the first time that Brady had violated the antitrust laws. According to Lem, Brady filed this action for an anticompetitive purpose, tied leases for its patented Markermatic machines with the pur-

chase of its wire marker cards, conspired with its distributors to set prices, and discriminated in price, all in violation of the Sherman and Clayton Acts.

## A. General Antitrust Principles

The purpose of antitrust law is to promote economic efficiency through protection of the competitive process, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Premier Electrical Construction Co. v. National Electrical Contractors Association, Inc.*, 814 F.2d 358, 368 (7th Cir.1987); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir.1986); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1437 (7th Cir.1986). This court must interpret and apply the Sherman and Clayton Acts with this fundamental principle in mind.

### 1. Sherman Act Section 1 Violations

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among several States, or with foreign nations ... shall be illegal." 15 U.S.C. § 1. In the landmark case of *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court clarified that Section 1 prohibits only unreasonable contracts, combinations and conspiracies in restraint of trade. Section 1 prohibits only unreasonable cooperative efforts because a certain type and amount of cooperation may be necessary for efficient production of goods and provision of services. *Premier Electrical*, at 370; *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188 (7th Cir.1985).

Over the years, courts have found certain types of contractual arrangements unreasonable as a matter of law, because they pose an unacceptable risk of stifling competition. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 9, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984). Courts presume that these "per se" illegal arrangements are unreasonable without inquiring as to whether the arrangement has had an anticompetitive effect in the relevant market. *Jefferson Parish*, 466 U.S. at

15–16, 104 S.Ct. at 1560; *Brillhart v. Mutual Medical Insurance Co.*, 768 F.2d 196, 199 n. 2 (7th Cir.1985); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Anticompetitive effect is still a requirement in these cases; however, courts conclusively presume anticompetitive effect because the type of conduct complained of is obviously destructive of free competition. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 n. 11 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir.1980).

■ Where the conduct complained of is of a type with which courts have had little experience, or a type which is not manifestly anticompetitive, courts analyzing the conduct under Section 1 apply the rule of reason standard. *United States Trotting Association v. Chicago Downs Association, Inc.*, 665 F.2d 781, 787–90 (7th Cir.1981). The rule of reason standard requires the plaintiff to show that the defendant's conduct caused an anticompetitive effect in the relevant market. *Lektro-Vend*, 660 F.2d at 268. Courts have traditionally applied the rule of reason standard in the majority of Section 1 challenges to allegedly anticompetitive contracts, combinations and conspiracies. *U.S. Trotting*, 665 F.2d at 787.

### 2. Sherman Act Section 2 Violations

■ Under Section 2 of the Sherman Act, no person may "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. In order to prove monopolization, a plaintiff must show, first, that the defendant possesses monopoly power, the power to control output and prices, in the relevant market. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 373 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987); *Ball Memorial Hospital, Inc. v. Mutual*

*Hospital Insurance, Inc.,* 784 F.2d 1325, 1334–36 (7th Cir.1986); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 430 (7th Cir.1980). Second, the plaintiff must demonstrate that the defendant engaged in conduct designed to. acquire, maintain or enhance its monopoly power improperly. *Olympia Equipment,* 797 F.2d at 373; *Chillicothe,* 615 F.2d at 430.

 A company attempts to monopolize in violation of Section 2 when it engages in a course of conduct which would, if successful, accomplish monopolization, and which, though falling short, so closely approaches monopolization as to create a dangerous probability of it. *Lektro-Vend,* 660 F.2d at 269–70. In order to prove attempt to monopolize, a plaintiff must show: (1) a specific intent to monopolize; (2) predatory or anticompetitive conduct in furtherance of the purpose to monopolize; and (3) a dangerous probability of success in the relevant market. *Lektro-Vend,* 660 F.2d at 270; *Chillicothe,* 615 F.2d at 430.

### 3. Price Discrimination Under The Robinson-Patman Act

Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), makes it unlawful for any person engaged in commerce to discriminate in price, directly or indirectly, between different purchasers of commodities of like grade and quality, where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce. Section 2(a) does not prohibit price differentials based on differences in the cost of manufacture, sale or delivery. Also, under Section 2(b), a seller may rebut a prima facie price discrimination case with evidence that it set its price in good faith to meet an equally low price of a competitor. Primary-line Robinson-Patman cases, such as the present case, involve a complaining competitor of the allegedly discriminating seller and focus on competitive injury in the seller's market. *Federal Trade Commission v. Anheuser-Busch, Inc.,* 363 U.S. 536, 544–46, 80 S.Ct. 1267, 1271–72, 4 L.Ed.2d 1385 (1960); *O'Byrne v. Checker Oil Co.,* 727 F.2d 159, 165 (7th Cir.1984).

### 4. Relevant Market

 An antitrust plaintiff must delineate the "relevant market" in Sherman Act Section 1 claims analyzed under the rule of reason, *Fishman,* 807 F.2d at 531, in Sherman Act Section 2 monopolization claims, *Id.,* in Sherman Act Section 2 attempted monopolization claims, *Lektro-Vend,* 660 F.2d at 270, and in some Robinson-Patman price discrimination claims, *United States v. E.I. DuPont De Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957); *National Dairy Products Corp. v. F.T.C.,* 412 F.2d 605, 612–13 (7th Cir.1969). The relevant market consists of both a geographic and a product market. *See, e.g., Fishman,* 807 F.2d at 531; *Kaiser Aluminum & Chemical Corp. v. F.T.C.,* 652 F.2d 1324, 1329 (7th Cir.1981). A relevant geographic market is the area in which the parties compete for the sale of the products that comprise the relevant product market. *Unity Ventures v. County of Lake,* 631 F.Supp. 181, 192 (N.D.Ill.1986). A relevant product market includes products consumers may reasonably interchange for the same purposes. *United States v. E.I. DuPont De Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *Fishman,* 807 F.2d at 531; *Kaiser,* 652 F.2d at 1330. In determining whether products are reasonably interchangeable, the court should consider "whether the product is unique or has close substitutes, as to which there are substantial cross-elasticities of demand." *Fishman,* 807 F.2d at 531. Also, the court should consider whether consumers actually use the products in a readily interchangeable manner. *Kaiser,* 652 F.2d at 1330.

### 5. Antitrust Injury

In order to recover under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, a plaintiff must prove it has suffered an "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. *See also Cargill, Inc. v. Monfort of Colorado, Inc.,* —— U.S. ——, 107 S.Ct. 484, 93

L.Ed.2d 427 (1986); *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1354 n. 7, 89 L.Ed.2d 538 (1986); *Fishman*, 807 F.2d at 532–35; *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1201–03 (7th Cir.1986). Injuries which do not constitute "antitrust injuries" include lost profits from an inability to continue to take advantage of illegally inflated prices, *Local Beauty*, 787 F.2d at 1203, and injuries arising from the preservation of competition in the market, *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697.

### B. Sham Litigation

■ Having briefly etched the legal context in which Lem's antitrust counterclaim arises, the court now considers each of Lem's claims. First, Lem asserts that Brady's complaint in this action is a sham, unentitled to immunity from antitrust liability under the *Noerr-Pennington* doctrine.[7] The *Noerr-Pennington* doctrine, based on the First Amendment, immunizes from antitrust liability bona fide lobbying and litigation efforts, regardless of any anticompetitive motive behind those efforts. *Premier Electrical*, at 371; *Winterland Concessions Co. v. Trela*, 735 F.2d 257, 263 (7th Cir.1984); *MCI Communications v. American Telephone and Telegraph Co.*, 708 F.2d 1081, 1153 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Havoco of America, Ltd. v. Hollobow*, 702 F.2d 643, 649–50 (7th Cir.1983); *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 471 (7th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). However, the *Noerr-Pennington* doctrine does not immunize "sham" litigation, suits brought for the purpose of harming one's competitors not by the result, but by the process, of the litigation. *Winterland*, 735 F.2d at 263–64; *Grip-Pak*, 694 F.2d at 472. In the Seventh Circuit, as well as many other circuits, a plaintiff need not show a pattern of baseless repetitive claims in order to recover under the antitrust laws;

even a single baseless, sham lawsuit lacks "the constitutional significance that warrants immunity from the antitrust laws." *MCI Communications*, 708 F.2d at 1155.

Lem claims that Brady brought this trademark action, not for the purpose of recovering damages for any alleged trademark infringement, but for the purpose of draining Lem's financial and manpower resources through the demands of the suit itself. According to Lem, Brady was aware, when it filed this action, that Lem had much less money than did Brady to spend on this suit, and that a suit in Illinois would remove Lem's principal officers from Lem's operations in Pennsylvania for a great deal of time. Also, Lem contends that it began using blue card stock for its card-mounted, pressure-sensitive wire markers in 1968, and that Brady never complained about Lem's use of blue until Brady filed this action in 1976, eight years later. Finally, Lem contends that the fact that Brady proceeded with this action after Lem, in 1976, agreed to stop using the alpha-numeric symbols L–184 and L–500, demonstrates Brady's desire to harass Lem with this lawsuit.

■ However, the court finds that Lem has failed to demonstrate that Brady's trademark complaint was "merely a ruse" and that Brady was not truly seeking a favorable outcome. *Havoco*, 702 F.2d at 651. Although Brady's financial and manpower resources are greater than that of Lem, Lem's antitrust counterclaim, rather than Brady's trademark claim, has demanded more of the parties' time, effort and expense in this suit. Also, Lem has unnecessarily added to the time and expense devoted to its counterclaim. In August, 1981, the court ruled that Lem failed to present all of its evidence relating to the cross-motions for partial summary judgment on Lem's Robinson-Patman claim, and assessed fees against Lem's counsel under 28 U.S.C. § 1927. *Brady v. Lem*, 521 F.Supp. 676 (N.D.Ill.1981).

---

**7.** The Supreme Court enunciated this doctrine in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); hence, its name.

Also, although Brady did not contact Lem about Lem's use of the color blue until it filed this action, Brady was not required under the trademark laws to initially request that Lem cease use of the color blue before seeking relief in court. Indeed, in light of Lem's refusal to cease use of the alpha-numeric symbols L–184 and L–500 after several informal Brady demands, Brady may have justifiably decided such demands regarding the use of blue would prove equally fruitless. Furthermore, with regard to Lem's use of L–184 and L–500, Lem did not agree to cease such use until after Brady had filed this action, and Brady may have thought it likely that Lem would resume such use after Brady dropped this claim or the entire suit. Finally, the court emphasizes that it was through discovery and presentation of the evidence at trial that Brady's lack of significant evidence regarding secondary meaning and likelihood of confusion was revealed. Accordingly, the court finds that Brady's single trademark suit is not a sham, and is entitled to immunity from antitrust liability under the *Noerr-Pennington* doctrine.

### C. Tying Arrangement

■■■ Lem contends that Brady tied leases for its Markermatic machines with purchases of Brady wire marker cards, in violation of Section 1 of the Sherman Act. A tying arrangement is "an agreement by one party to sell a product (the tying product) to another on the condition that the buyer also purchase a different product (the tied product)." *Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.*, 758 F.2d 203, 207 (7th Cir.1985) (*citing Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 56, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958)). The key characteristic of an illegal tying arrangement is the seller's exploitation of its control over the tying product in order to force the consumer to purchase the tied product when the consumer does not want to purchase the tied product at all or on the seller's terms. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). When such anticompetitive "forcing" is probable, as in the case where the seller has a patent or similar monopoly over the tying product, per se condemnation—condemnation without regard to actual market conditions—is appropriate. *Jefferson Parish*, 466 U.S. at 15–18, 104 S.Ct. at 1560–61. *See also Carl Sandburg*, 758 F.2d at 207 (in order to establish the per se illegality of a tying arrangement, a plaintiff must show, among other things, that the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product).

■■■ A plaintiff who fails to demonstrate that a tying arrangement is per se illegal may still demonstrate the arrangement's invalidity under the rule of reason. *Jefferson Parish*, 466 U.S. at 29, 104 S.Ct. at 1567; *Carl Sandburg*, 758 F.2d at 210. In order to prevail under the rule of reason, the plaintiff must show that the agreement actually, unreasonably restrained competition in the relevant market for the tied product. *Jefferson Parish*, 466 U.S. at 29–31, 104 S.Ct. at 1567–68. *Cf. Carl Sandburg*, 758 F.2d at 210 (a plaintiff must show, under both the per se and rule of reason analyses, that there is a "substantial danger" that the seller will acquire market power in the tied product market).

■■■ This court now finds that Lem has failed to demonstrate that Brady tied the sale of its wire marker cards to the lease of its Markermatic machines under both the per se and rule of reason analyses because Lem has failed to establish the essential characteristic of an illegal tying arrangement: anticompetitive "forcing." The Markermatic leases do not require and have never required lessees to use only Brady wire marker cards. Rather, the leases provide that (1) the lessee must use only wire markers that will not "jam" or damage the Markermatic; (2) the lessee shall be liable to Brady for damages resulting from the use of incompatible cards; and (3) Brady will analyze the compatibility of any cards the lessee submits and will notify the lessee of its compatibility determination. *See* Brady Exhibit ("PX") 347 at 2.

The leases do not state that Lem and Stranco cards may be used in Brady Markermatics, although such is the case. However, Brady has never provided its Markermatic lessees with a list of all wire marker cards which may be used in the Markermatic, and Brady has no duty under the antitrust laws to provide such a list. *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980). *Cf. Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (under Section 2 of the Sherman Act, a monopolist has no general duty to engage in a joint marketing program with junior competitors, but it may not exclude junior competitors by significantly altering a pattern of distribution which originated in a competitive market); *Olympia*, 797 F.2d 370 (a monopolist has no duty to act as its competitor's sales agent, but may not refuse to cooperate where cooperation is indispensable to competition).

The Markermatic lease provisions do not establish anticompetitive "forcing;" lessees are free to use compatible non-Brady cards under the leases. In order to recover on this claim, therefore, Lem must demonstrate that Brady applies the lease provisions so restrictively that the leases constitute a de facto tying arrangement. *Photovest*, 606 F.2d at 722. Lem does not contend that Brady, in practice, withheld approval of Lem or Stranco cards unreasonably; in fact, the evidence indicates that none of the Markermatic lessees ever submitted a wire marker card to Brady for a compatibility determination.

Lem points, however, to an isolated incident involving one Brady salesman as evidence that Brady, in practice, forced its Marketmatic lessees to use only Brady cards with the machines. According to Lem, in 1975, William Curtin, Brady's senior sales agent for northern Ohio, threatened to remove Flexible Company's Markermatic machine if Flexible used a non-Brady wire marker card in the machine. At trial, however, Curtin testified that Brady's regional sales manager reprimanded him for his overzealousness, and that he returned to Flexible within a few weeks to retract his threat. *See* Tr. of December 8, 1982 at 35–38.

This court finds the isolated Flexible incident insufficient to support Lem's claim that Brady engaged in anticompetitive forcing in practice. If a seller coerces only a single purchaser to buy a tied product, the resultant impact on competition is insufficient to warrant the concern of antitrust law. *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560. Lem must demonstrate that Brady, through the alleged tying arrangement, foreclosed a substantial volume of commerce in wire marker cards. *Id.* This Lem failed to do.

### D. Blanket Contracts

Lem contends that Brady entered into blanket contracts with its customers which violated the antitrust laws in three respects. First, Lem asserts that, under the blanket contracts, Brady prohibited its customers from purchasing wire markers from other manufacturers. According to Lem, the blanket contracts were therefore exclusive dealing arrangements in violation of Section 1 of the Sherman Act. Second, Lem contends that Brady engaged in discriminatory pricing in the blanket contracts in violation of the Robinson-Patman Act. Third, Lem contends that Brady used the blanket contracts to establish maximum resale prices for its wire marker cards in violation of Section 1 of the Sherman Act.

Before considering the alleged violations, the court first examines the blanket contracts and Brady's distribution system. Most, if not all, of the blanket contracts in question are between Brady and its independent distributors. The blanket contracts are merely price guarantees; Brady agrees to sell to an independent distributor a type of wire marker for a certain price over a certain period of time, usually one year. The distributor's actual price is a function of two figures in the contract: a suggested retail price minus a percentage distributor discount. The contract states that the distributor must buy a certain quantity of wire markers during the contract term, and may not place orders for less than a certain minimum quantity or

"release," usually ten percent of the total to be ordered during the contract term. The contract also states that the distributor must sell the wire markers purchased under the contract to the ultimate customer identified in the contract.

Brady's nationwide salesforce secures information regarding (1) independent distributors who desire blanket contract quotes from Brady for the sale of wire markers to certain customers; (2) prices available to those customers from Brady's competitors; and (3) the customers' approximate annual need for wire markers. With this information, Brady develops blanket contract quotes for the interested independent distributors. The quotes set the terms of the proposed agreements between Brady and the distributors. The independent distributors then submit bids to the ultimate customers. The terms of the distributors' bids to the customers, including price, need not mirror those in Brady's quotes to the distributors; the distributors are free to set the terms of their contracts with customers as they see fit. *See* DX 113B; DX 336 at 133–35; DX 337 at 41, 126–27; DX 339 at 199; PX 338 at 72, 111, 158–59, 211–12. However, Brady suggests, in its blanket contracts with distributors, a retail price that it has estimated will meet the price of competitors for the customer's business; the distributors, therefore, are likely to charge this price on Brady's advice in order to get the customer's business. Customers select a distributor from those bidding, and enter into a contract with the distributor. Should a Brady distributor enter into a contract with a customer, the distributor then accepts Brady's quote.

### 1. *Exclusive Dealing*

Lem asserts that Brady and its independent distributors conspired, in the blanket contracts, to prohibit Brady customers from buying non-Brady wire markers during the term of the contracts. It is clear that a vertical combination such as the exclusive dealing conspiracy alleged may violate Section 1 of the Sherman Act. *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346, 1352 (7th Cir. 1982). However, the court must analyze such combinations under the rule of rea-

son. *Id.* (*citing Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). In other words, in order to recover, Lem must show that the vertical agreement in question resulted in a substantial foreclosure of competition in the relevant market. *Dos Santos,* 684 F.2d at 1352. *See also Jefferson Parish,* 466 U.S. at 30 n. 51, 104 S.Ct. at 1568 n. 51.

The court now finds that Lem has failed to show that Brady conspired with its distributors to enter into illegal requirement contracts with customers. First, it is important to note that Brady, for the most part, contracted with its distributors, which, in turn, contracted with the ultimate customers. Most of Lem's evidence at trial concerned the Brady/distributor contracts. Lem did not produce any substantial evidence concerning the distributor/customer contracts; nor did it demonstrate that the distributor/customer contracts had to, or actually did, mirror the Brady/distributor contracts. Therefore, with respect to the majority of customers, there was no evidence that the customers entered into any contracts at all, let alone that they entered into the alleged requirement contracts.

Second, assuming that the terms of the distributor/customer contracts mirrored those in the Brady/distributor contracts, and to the limited extent that Lem showed that Brady contracted directly with customers, Lem failed to show that there actually was any type of restraint, reasonable or unreasonable, involved in the blanket contracts. As Brady demonstrated at trial, the blanket contracts did not expressly prohibit distributors or customers from buying wire markers from other manufacturers during the term of the contract. The contracts only required that distributors or customers buy a certain amount of Brady wire marker cards during the contract term. Granted, Brady often set the annual amount to be ordered at a level estimated to be the customer's annual need for wire markers. However, customers could and did buy from other manufacturers, and Brady never took any action against a distributor or customer which did not order the set total amount during the contract term. *See* Tr. of November 8, 1982 at 831.

Third, even if Lem had demonstrated a conspiracy to restrain competition through the blanket contracts, Lem failed to establish the relevant product market, and therefore failed to show that such a restraint substantially foreclosed competition in the relevant market. The parties agree that the relevant geographic market is a nationwide market, but the parties do not agree as to the relevant product market. At trial, Lem asserted that there is a product market for wire markers of the adhesive tape type which includes wire marker cards, wire marker card booklets and roll tape wire markers. According to Lem, wire marker cards alone constitute a submarket, which is the relevant product market in this case.

Brady contended at trial that the relevant product market is not wire marker cards only, nor is it merely wire markers of the adhesive tape type. According to Brady, all wire marking systems, including heat-shrinkable, computer-generated, color-coded, clip-on, and hot stamp wire markers, are "reasonably interchangeable" and therefore constitute the relevant product market in this case. *DuPont*, 351 U.S. at 395, 76 S.Ct. at 1007; *Fishman*, 907 F.2d at 531; *Kaiser*, 652 F.2d at 1330. Brady presented very substantial testimony at trial from Lem's own manufacturer representatives, from wire marker customers and from a representative of another wire-marker manufacturer, Thomas & Betts, to the effect that all of the wire marking systems serve the same purpose, actually compete with each other, and actually are used interchangeably by wire marker purchasers. *See* Tr. of December 7, 1982 at 1432–34, 1438–39, 1442–45, 1448–53. Most, if not all, of the wire marker manufacturers make or market more than one type of wire marking system, and customers do switch systems, sometimes from day to day. The court therefore finds that the relevant market in this case consists of all wire marking systems. The evidence simply does not establish that the relevant product market is a submarket consisting only of card-mounted, pressure-sensitive wire markers.

▉ Lem argues that, because the price of the material for some wire mark-ing systems is much higher than that for card-mounted, pressure-sensitive wire markers, the systems are not readily interchangeable and there is no cross-elasticity of demand between the systems. However, under *DuPont*, it is clear that products, to be in the same relevant market, need not be identical or even near in price. *DuPont*, 351 U.S. at 396, 400–01, 404, 76 S.Ct. at 1008, 1010, 1012. The relevant market is composed of products which are reasonably interchangeable in terms of price, quality and use; a higher priced product of superior quality may be interchangeable with a lower priced, lower quality product. *Id.* Furthermore, in the present case, price includes not only the cost of the materials, but the cost of application of the materials. Lem failed to adequately take quality and cost of application into consideration in its price comparison.

Lem also contends that the systems are not interchangeable because all systems cannot be put to all uses. However, *Du-Pont* does not require absolute functional interchangeability between products; rather, it is enough that there is a "very considerable degree" of functional interchangeability between the products. *Id.* at 399, 76 S.Ct. at 1009. Lem's isolated example of an inappropriate use for one type of system, in its final argument on November 23, 1984, does not establish that there is a considerable lack of functional interchangeability between all of the systems. Brady presented extensive, credible testimonial evidence regarding the actual, considerable functional interchangeability of the systems. The court therefore finds that Lem failed to meet its burden of establishing the relevant product market; the relevant market in this case consists of all wire marking systems. Lem consequently failed to show that the alleged requirement contracts unreasonably restrained competition in the relevant market.

### 2. Price Discrimination

▉ In order to establish a prima facie case of price discrimination in violation of the Clayton Act, as amended by the Robinson-Patman Act, an antitrust plaintiff must show that (1) the defendant seller is engaged in commerce; (2) the defendant

directly or indirectly discriminated in price between different purchasers of commodities of like grade and quality; (3) either or any of such purchases were in commerce; and (4) there is a reasonable possibility that a price difference may harm competition. 15 U.S.C. § 13(b); *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). Once an antitrust plaintiff has established a prima facie case, the defendant may rebut the prima facie showing with a cost-justification defense under section 2(a), or a meeting-competition defense under Section 2(b), of the Clayton Act. The defendant bears the burden of proving either defense. *Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 35 (7th Cir.1976).

 An antitrust plaintiff has standing to assert a primary-line Robinson-Patman claim only if he directly competes with the discriminating seller, in other words, only if he and the defendant are selling to the same customers.[8] *Bolick-Gillman Co. v. Continental Baking Co.*, 206 F.Supp. 151, 155 (D.Nev.1961). A manufacturer does not compete with a competitor of its independent distributor unless the manufacturer exercises some measure of control over its distributor. *Id.* at 157. *See also Gas-A-Car, Inc. v. American Petrofina, Inc.*, 484 F.2d 1102, 1106–07 (10th Cir.1973) (defendant-wholesalers dictated the retail price of its gasoline and therefore competed with plaintiff-retailers); *USA Petroleum Co. v. Atlantic Richfield Co.*, 577 F.Supp. 1296, 1303 (C.D.Cal.1983) (same). *Cf. Windy City Circulating Co. v. Charles Levy Circulating Co.*, 550 F.Supp. 960, 966 (N.D.Ill.1982) (in secondary-line Robinson-Patman case, plaintiff is indirect purchaser, and therefore has standing to sue defendant seller, if the defendant controlled the purchase price charged by the distributor); *Wales Home Remodeling Co., Inc. v. Alside Aluminum*, 443 F.Supp. 908, 912 (E.D.Wis.1978) (same).

 In the present case, Brady established with credible evidence at trial that, under most, if not all, of the blanket contracts, it sold its wire markers to independent distributors, who were free to set the terms of their contracts with customers as they saw fit. *See* DX 113B; DX 336 at 133–35; DX 337 at 41, 126–27; DX 339 at 199; PX 338 at 72, 111, 158–59, 211–12; Tr. of November 8, 1982 at 839, 855, 906. Lem failed to produce any persuasive evidence that Brady dictated the ultimate price to the customer; therefore, Lem failed to show that it directly competed with Brady. Lem consequently lacks standing to challenge most, if not all, of Brady's blanket contracts under the Robinson-Patman Act.

 However, even if Lem could show Brady dictated retail prices in the

---

**8.** In ruling on the parties' cross-motions for partial summary judgment on Lem's Robinson-Patman claim, the court found that Lem lacked standing to challenge Brady's alleged discriminatory prices to some companies because Lem did not show that it directly competed with Brady for the business of those companies; therefore, the court limited the controverted issues of fact remaining for trial under Fed.R. Civ.P. 56(b) to those companies for whose business Lem and Brady directly competed. *See* Memorandum Opinion and Order of December 29, 1980. After the court's ruling, Lem, for the first time, came forward with affidavits indicating that it had directly sought to attain the business of many of the companies. The court consequently granted Lem's motion for reconsideration of the December 29, 1980 order, and ruled that it would not limit the Robinson-Patman factual issues remaining for trial. *See* Memorandum Opinion and Order of May 11, 1981. In the May, 1981 order, however, the court ruled that Lem could not present evidence pertaining to any alleged discriminatory prices Brady offered to Reliance Electric Co. ("Reliance"), because Lem's evidence revealed that, during Lem's single attempt to solicit Reliance's business, it offered a lower price than Brady offered. *Id.* at 3–4.

At and after trial, Brady moved to strike evidence relating to 34 companies, which Lem claims received discriminatory prices from Brady, on the basis that Lem failed to produce sufficient evidence at trial that it directly competed with Brady for the business of those 34 companies. In moving to strike, however, Brady recognized that, should the court grant Brady's motion and strike the evidence from consideration under the Robinson-Patman Act, the court could still consider the evidence under Lem's Sherman Act Section 2 claim.

The court reserved ruling on the motion to strike until its decision on the merits. The court now denies the motion to strike, but finds that Lem's evidence fails to show that it directly competed with Brady for the business of many, if not all, of the customers' business.

distributor/customer contracts, and to the extent that Lem and Brady did directly compete,[9] Lem's claim still must fail. Brady contended at trial, and this court now finds, that Lem failed to show a reasonable possibility of harm to competition in the relevant market, and therefore failed to establish a prima facie case of price discrimination.[10] An antitrust plaintiff may demonstrate a reasonable possibility of harm to competition with a market analysis or evidence of predatory intent. *Double H Plastics, Inc. v. Sonoco Products Co.*, 732 F.2d 351, 354 (3rd Cir.), *cert. denied*, 469 U.S. 900, 105 S.Ct. 275, 83 L.Ed.2d 212 (1984); *National Dairy Products Corp. v. Federal Trade Commission*, 412 F.2d 605, 612–13 (7th Cir.1969); *Lloyd A. Fry Roofing Co. v. Federal Trade Commission*, 371 F.2d 277, 281 (7th Cir.1966).

Lem failed to present any credible, persuasive market study evidence in support of its claim of possible injury to competition. As stated above, Lem failed to meet its burden of demonstrating that the relevant market includes only wire marker

cards, and Lem presented no evidence relating to a market composed of all wire marking systems. Even were the court to assume that wire marker cards alone comprise a relevant market, Lem's evidence shows that, during the relevant time period, Lem's sales and market share continued to increase in this alleged market, while Brady's market share decreased slightly. Also, the evidence establishes that, during the relevant period, wire marker card prices did not drastically decline, as frozen pie prices did in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). Rather, wire marker card prices generally increased.

▇▇ Lem also failed to present persuasive evidence demonstrating predatory intent. An antitrust plaintiff may show predatory intent by express evidence or by inference from predatory conduct such as below-cost pricing.[11] *Double H*, 732 F.2d at 354.

▇▇▇ At trial, Lem introduced alleged express evidence of predatory intent,

9. The evidence at trial demonstrated that Brady and Lem rarely, if ever, directly competed for a customer's business. The evidence revealed that Lem, as well as Brady, sold through independent distributors who were free to contract with the ultimate customers as they saw fit. *See* PX 341 at 7, 17; PX 335 at 47–49; Tr. of November 9, 1982 at 28–30. Therefore, in most cases, any direct competition took place between the distributors of Brady and Lem wire markers; not between Brady and Lem. Lem presented little, and inconclusive, evidence that it directly competed with Brady for the business of certain distributors or customers.

10. The court notes that Lem established all other elements of a price discrimination prima facie case. At trial, Lem presented evidence that Brady is engaged in commerce, that Brady, in the blanket contracts, discriminated in price between different wire marker card purchasers for purchases of the same type and quantity of cards, and that such purchases were in commerce. Brady, during the relevant time period, had extended wire marker card price lists which, logically, established lower prices per hundred cards for orders of greater quantities of cards. Lem demonstrated that Brady offered prices below its extended price lists to blanket contract distributors in two ways. First, Brady set the blanket contract price based on the total quantity to be ordered annually, not on the quantity per order. For example, if the price for an order of 5,000 cards were $30 per hundred cards in the extended price list, and the

price for an order of 25,000 cards were $10 per hundred cards, a blanket contract distributor who ordered 5,000 cards, but who was scheduled to purchase 25,000 cards during the contract term, would pay at the price set for orders for 25,000 cards, or $10 per hundred, not $30 per hundred. Second, in certain blanket contracts, Brady set the price below the rate set in the extended price list for the total quantity to be ordered annually. For example, the same blanket contract distributor would be scheduled to purchase a total of 25,000 cards during the contract term, but would pay only $5 per hundred cards for each order under the contract. The court notes that the prices in these examples are not the actual prices Brady offered to its blanket contract distributors.

11. Brady contends that Lem's Robinson-Patman claim is a predatory pricing claim; therefore, Lem must demonstrate that Brady priced below some measure of cost in order to prevail. An antitrust plaintiff may challenge a predatory pricing policy under Section 2 of the Sherman Act, and under the Robinson-Patman Act where that Act's requirements are met. If the plaintiff proceeds under Section 2 of the Sherman Act, the plaintiff will more than likely need to demonstrate that the defendant set its price below some measure of cost in order to prevail. *See MCI Communications*, 708 F.2d at 1123 n. 59; *Chillacothe*, 615 F.2d at 432.

In any event, Lem's challenge to the pricing in the blanket contracts is based on the Robinson-

including evidence of (1) a telephone call during which Brady's sales manager informed Klumpp that William H. Brady, Jr. objected to Lem entering the wire marker business, *see* Tr. of November 4, 1982 at 680–83; (2) a Brady memorandum to all salesmen and district managers requesting information as to all of Lem's competitive activity, *see* DX 252; and (3) various statements by Brady's sales staff in the blanket contract information sheets identifying Lem as a competitor or indicating a desire to "eliminate" competition, *see* DX 112E, 114, 133A, 137C, 206MM, 210H, 214G. The court should approach such purported expressions of predatory intent warily, considering that the intention of every employee is not relevant, the meaning of expressions may often be obscure, and the intent to maintain or increase business is presumptively lawful. *MCI Communications*, 708 F.2d at 1113; *Jays Foods, Inc. v. Frito-Lay, Inc.*, 614 F.Supp. 1073, 1083–84 (N.D.Ill.1985). The court finds Lem's alleged express evidence insufficient to establish predatory intent. At most, these statements constitute "naive expressions of competitive zeal." *Jays Foods*, 614 F.Supp. at 1084. The court must therefore consider Lem's evidence of predatory conduct.

Lem did not present any evidence at trial that Brady priced its wire marker cards below any measure of cost. In fact, the evidence demonstrated that Brady's list and blanket contract prices have always included a profit margin. *See* Tr. of November 23, 1982 at 1018. Lem instead pointed to evidence of other alleged predatory conduct from which the court could infer predatory intent, such as the filing of this alleged "sham" lawsuit, the alleged tying arrangement between Brady's Markermatics and wire marker cards, Brady's surveillance of Lem when Lem first entered the wire marker business and Brady's partially successful efforts to acquire Lem's private brand business. This evidence is insufficient to raise an inference of predatory intent. As set forth above, this suit is not a "sham" and Brady has not tied its Markermatics to its wire marker cards. Also, although Brady observed Lem when Lem began operations, Lem does not allege that Brady engaged in any tortious industrial spying. Brady wisely sought information about Lem in order to prepare itself for the entrance of a new competitor into the wire marker business. In addition, Brady's effort to acquire Lem's private brand distributors does not demonstrate predatory intent, but the essence of competition.

Accordingly, the court finds that Lem has failed to demonstrate, through market analysis or evidence of predatory intent, a reasonable possibility of injury to competition. Lem has therefore failed to establish a prima facie price discrimination case under the Robinson-Patman Act.[12]

Patman Act, not Section 2 of the Sherman Act. As set forth in the text, under the Robinson-Patman Act, a plaintiff may show a reasonable possibility of harm to competition through market analysis, express evidence of predatory intent, or evidence of predatory conduct from which the court may infer predatory intent. It may be that a Robinson-Patman plaintiff relying on predatory conduct to establish a reasonable possibility of harm to competition may need to demonstrate below-cost pricing in order to prevail, as under Section 2 of the Sherman Act. *See D.E. Rogers Associates, Inc. v. Gardner-Denver Co.*, 718 F.2d 1431, 1438–40 (6th Cir.1983) (equating proof necessary under the Robinson-Patman Act with that necessary under Section 2 of the Sherman Act in predatory pricing cases); *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). *See generally* Hovencamp, *Economics and Federal Antitrust Law* § 6.12 at 189–90 (1985). This court need not reach this question, however, as the court finds that Lem failed to present any evidence, price-cost evidence or otherwise, demonstrating a reasonable possibility of harm to competition.

12. Furthermore, as to the limited instances in which Lem directly competed with Brady for the business of certain customers and distributors, not only did Lem fail to establish a prima facie case of price discrimination, but Brady presented persuasive, voluminous evidence that it set its blanket contract prices to meet the equally low prices of its competitors. *See* Tr. of November 8, 1982 at 840–46, 858, 875–85, 903; Tr. of November 23, 1982 at 1015–18; Tr. of December 6, 1982 at 1241–42; PX 338 at 30, 36, 45–71, 84–87, 108, 125; DX 293A at 1–2. The evidence establishes that Brady had a policy of obtaining information regarding available competitive prices before setting blanket contract prices, and the court finds that a reasonable and prudent person examining the information that Brady collected would believe that the price

### 3. Maximum Resale Price Maintenance

Lem contends that Brady engaged in resale price maintenance in its blanket contracts with distributors. As previously stated, Brady's distributors were free to set the prices in their contracts with customers as they saw fit. Brady recommended, but did not set, the resale price. Therefore, Brady did not engage in resale price fixing in its blanket contracts with distributors. *See Morrison*, 797 F.2d at 1435.

 Each blanket contract did, however, restrict sales to a certain customer. A supplier may impose a customer restriction, as long as the restriction is reasonable. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Morrison*, 797 F.2d at 1435. As in all rule of reason analyses, in order to establish that a customer assignment is unreasonable, a plaintiff must first prove that the supplier had significant market power, which is the power to raise prices above the competitive level in the relevant market without losing profits from reduced sales. *Morrison*, 797 F.2d at 1435. Lem did not present any evidence at trial that Brady possessed significant power in the relevant market, which includes all wire marking systems. Therefore, Lem's claim that the contracts contain unreasonable customer assignments must fail.

### E. Monopolization And Attempt To Monopolize

 As stated earlier in this opinion, in order to prove monopolization in violation of Sherman Act Section 2, an antitrust plaintiff must show that the defendant possesses monopoly power in the relevant market and is engaged in conduct designed to acquire, maintain or enhance its monopoly power improperly. *Olympia Equipment*, 797 F.2d at 373; *Chillicothe*, 615 F.2d at 430. Lem presented evidence at trial that Brady possesses approximately fifty percent of the alleged relevant market for pressure-sensitive, card-mounted wire markers. According to Lem, considering the structure of this market, and Brady's allegedly wrongful conduct in filing this suit, tying its Markermatic with its wire marker cards, entering into blanket contracts, attempting to get the business of Lem's private brand distributors and keeping close watch over Lem's activities, Brady clearly wrongfully monopolized the relevant market.

 Once again, Lem's failure to prove that the relevant market consists only of card-mounted, pressure-sensitive wire markers proves fatal to its claim. Lem presented no evidence at trial regarding Brady's share, or the structure, of the market of all wire marking systems. Lem therefore failed to demonstrate that Brady wrongfully monopolized the relevant market.

 Furthermore, even were the court to assume that the relevant market is limited to a submarket of card-mounted, pressure-sensitive wire markers, Lem's claim would still fail. A manufacturer which possesses fifty percent of the market may not necessarily possess monopoly power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (holding that courts may infer the existence of monopoly power from the fact that the defendant holds a "predominant" share, such as 80, 87 or 90 percent, of the market); *United States v.*

---

Brady charged was generally available to the customer from Brady's competitors. *Falls City*, 460 U.S. at 438, 103 S.Ct. at 1290; *Holleb*, 532 F.2d at 35.

The court notes that it is unclear whether Brady may rely on the meeting competition defense of Section 2(b) of the Clayton Act for the majority of its blanket contracts which it entered into with distributors instead of ultimate customers. Brady's meeting competition defense focuses on competitive prices available to the customers, not the distributors.

Apparently, Brady contends that it set the prices in the Brady/distributor contracts at a level which would enable the distributor to offer the ultimate customer a price available to the customer from Brady's competitors or their distributors. This court need not determine whether the meeting competition defense may extend to meeting the competition of the ultimate customer where the manufacturer deals through a truly independent distributor, as the court finds that Lem has failed to establish a prima facie case of price discrimination.

*United States Steel Corp.,* 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920) (defendant's control of 50 percent of market insufficient to establish market power). Also, the fact that Stranco, Lem and Panduit entered the card-mounted, pressure-sensitive wire marker market subsequent to Brady's entry, and that Lem did so with a minimal initial investment, *see* Tr. of November 2, 1982 at 474; Tr. of November 4, 1982 at 677–78, demonstrates the ease of entry into this market, and, therefore, refutes Lem's claim that Brady held monopoly power in the alleged market. Moreover, a number of newer wire marking products are evolving with larger companies entering the field.

■ In any event, the abuse, not the possession, of monopoly power violates Section 2. *Olympia Equipment,* 797 F.2d at 374. Lem failed to demonstrate at trial that Brady abused any monopoly power it may have had. As set out above, Lem failed to show that this action is a sham lawsuit, that Brady engaged in an unlawful tying arrangement, or that Brady's blanket contracts violated the antitrust laws in any way. At most, Lem showed that Brady competed aggressively with the other wire marker card manufacturers, conduct which the antitrust laws seek to promote. *Id.* at 375. Accordingly, the court finds that Lem failed to demonstrate that Brady unlawfully monopolized the card-mounted, pressure-sensitive wire marker market.

As set out above, in order to prove that Brady attempted to monopolize the relevant market in violation of Sherman Act Section 2, Lem must show that Brady specifically intended to monopolize the market, that Brady engaged in predatory or anticompetitive conduct in furtherance of its plan to monopolize the market, and that there was a dangerous probability that Brady would succeed in monopolizing the market. *Lektro-Vend,* 660 F.2d at 270; *Chillacothe,* 615 F.2d at 430. Lem failed to present evidence at trial that Brady specifically intended to monopolize, or engaged in predatory conduct in order to monopolize, any market, whether it consists of wire marker cards only or all wire marking systems. Lem's alleged express evidence of Brady's intent to harm Lem

merely reflects Brady's competitive zeal. Brady did not engage in unlawful tying and did not file this action in order to burden Lem through the process, and not the result, of this action. Brady's blanket contracts did not amount to unlawful exclusive dealing arrangements, price discrimination or resale price maintenance. Brady's partially successful attempts to secure the business of Lem's private branders, and Brady's surveillance of Lem's activities, constitute the essence of competition, rather than anticompetitive conduct. Therefore, the court finds that Lem failed to show that Brady attempted to monopolize any market in violation of Section 2.

### F. Antitrust Injury

■ As stated earlier, in order to recover under Sections 4 and 16 of the Clayton Act, an antitrust plaintiff must show that it has suffered an "antitrust injury," an injury of the type the antitrust laws were intended to prevent and which flows from that which makes the defendant's acts unlawful. *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697.

Lem contends that, as a result of the combined effect of all of Brady's allegedly illegal and anticompetitive activities, competition, not just Lem, has suffered. In support of its competitive injury allegation, however, Lem only produced evidence showing that, with respect to card-mounted, pressure-sensitive wire marker cards, Lem's sales and profits continued to increase during the relevant time period, but at a slower pace.

■ This court finds that Brady's activities, taken individually or as a whole, did not cause any injury to competition in the card-mounted, pressure-sensitive wire marker market, a market which this court, in any event, finds is not a relevant market for the purpose of antitrust analysis. Brady's aggressive but lawful activities, if anything, increased price competition in this market during the relevant time period. Congress did not enact the antitrust laws in order to protect business profits from the threat or effect of increased price competition. Lem failed to demonstrate that it

suffered an antitrust injury as a result of any of Brady's actions.

## IV. Conclusion

For all of the reasons set forth above, the court hereby enters judgment in favor of Lem on Brady's trademark complaint, and in favor of Brady on Lem's antitrust counter-complaint.